**SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,**

v.

**OKLAHOMA CORPORATION COMMISSION, Respondent.**

No. 80579.

Supreme Court of Oklahoma.

April 13, 1994.

Andrew M. Coats, Richard C. Ford, Crowe & Dunlevy, Melanie S. Fannin, Roger K. Toppins, Oklahoma City, for petitioners.

Maribeth D. Snapp, Patricia A. Morris, Oklahoma Corp. Com'n, Rick Chamberlain, Office of the Atty. Gen., Robert D. Allen, Ronald E. Stakem, Clark, Stakem, Pherigo, & Douglas, Ron Comingdeer, Oklahoma City, Eric R. King, King & King, Edmond, Jerry Cord Wilson, Nancy Thompson, Oklahoma City, Major Kenneth C. Kitzmiller, Staff Judge Advocate, Tinker AFB, Laurence M. Huffman, Elizabeth S. Wood, McAfee & Taft, William J. Bullard, Williams, Box, DeBee, Forshee, Synar & Bullard, Cody Waddell, Anderson & Waddell, David Lee, Lee & Fields, Michael J. Hunter, Oklahoma Corporation Commission, Oklahoma City, for respondents.

SIMMS, Justice:

In this original proceeding Southwestern Bell Telephone Company (SWB) seeks this Court's order disqualifying Corporation Commissioner Anthony (Anthony) from further participation in Corporation Commission proceeding PUD–260, a rate hearing, as well as in all pending and future SWB cases. SWB asserts that Anthony is biased and prejudiced against it, and his continued participation in cases where its substantive rights are at issue will deny SWB its right to due process of law because it will not be able to receive a fair hearing from an impartial tribunal.

## I.

The focus of SWB's claim centers on Commissioner Anthony's startling public announcement on October 2, 1992, that for four years he had been secretly acting as an investigator and informant in an ongoing FBI investigation concerning the conduct of his fellow commissioners and employees and representatives of SWB.[1] SWB asserts that

1. That statement in its entirety follows:
 "As Chairman of this Commission, I feel compelled by judicial ethics to advise the parties to Southwestern Bell case PUD 260 that there have been serious irregularities and unethical conduct involving this matter while it has been before the Commission. There is evidence that one or more commissioners were involved in improper conduct, and I have given this evidence to the FBI. Furthermore, I have filed a bar complaint against two attorneys who have been associated with Southwestern Bell and who may have been engaged in improper activities. The parties to this case should pursue whatever remedies are necessary to protect their rights.
 "As an additional matter which has at least partial bearing on the PUD 260 case or other Southwestern Bell cases, I am advising the parties that since late 1988 I have worked with the FBI to investigate corruption at the Corporation Commission. On numerous occasions since I became a commissioner in 1989, individuals associated with regulated companies have offered me cash or inducements.
 "With the FBI advised in advance, on several occasions, I have received thousands of dollars in cash which I immediately gave to the FBI as evidence in their investigation. In cases where cash was received, a utility attorney, a utility lobbyist, and/or a utility officer was involved.
 "Furthermore, I will report that more than a year ago I separately advised a Southwestern Bell senior corporate officer and then later a senior corporate attorney with Southwestern Bell of the conduct of persons associated with their firm.
 "I have delayed making this announcement for as long as possible in order to avoid compromising the Federal investigation. I have been

Anthony's announcement makes it clear that he has formed an opinion that SWB's agents and employees have engaged in improper conduct; that he has conflicting interests because of his different public and undisclosed roles, and, as a result of his investigation, he may be a potential witness in future proceedings against SWB. These facts, SWB argues, make it patently impossible for Anthony to be a neutral and unbiased adjudicator of its rights and interests before the Commission.

SWB argues that the same federal and state due process requirements which assure litigants in judicial proceedings a right to be heard by an impartial judge in a fair hearing apply with equal force in administrative hearings, and they should apply to the Corporation Commission hearing on PUD–260 and to Commissioner Anthony who sits, SWB contends, in an adjudicatory capacity. SWB asserts that Anthony's conduct and public statement, together with a motion he filed in the case below, seeking to compel SWB to produce certain records, present fundamental issues regarding its right to due process. SWB claims that Anthony's position is the same as a judge and the Canons of Judicial Conduct, 5 O.S.1991, Ch. 1, App. 4, require him to voluntarily disqualify in these circumstances. Because he refuses to do so, this Court should exercise its Okla. Const. Art. 7, Sec. 4 superintending control over the judiciary and issue its writ to prohibit Anthony from further participation in an adjudicatory capacity in SWB's cases.

We assume original jurisdiction but deny the requested relief. Rehearing of our decision issued on May 25, 1993, is granted and that decision is withdrawn.

## II.

 The Corporation Commission is created by Article 9 of our Constitution. Its three members are elected by the people at a general election and a concurrence by a majority of the Commission is necessary to decide any question. Among the many powers and duties given the Commission, it is re-

quired to exercise the authority of the state to supervise, regulate and control public service corporations, and to that end it has been clothed with legislative, executive and judicial powers. Okla. Const. Art. 9, §§ 15, 18, 19, and 20. *St. Louis & S.F.R. Co. v. Williams,* 25 Okla. 662, 107 P. 428 (1910). *Russell v. Walker,* 160 Okla. 145, 15 P.2d 114 (1932); *Oklahoma Cotton Ginners' Ass'n. v. State,* 174 Okla. 243, 51 P.2d 327 (1935).

The validity of the union of these powers in one constitutional body has been upheld and found consistent with the separation of powers provision, Okla. Const. Art. 4, § 1, as well as Okla. Const. Art. 7, § 1, which vests judicial power in certain constitutionally and statutorily created courts and tribunals. *Monson v. State, ex rel., Oklahoma Corp. Comm.,* 673 P.2d 839 (Okla.1983); *Oklahoma Cotton Ginners' Ass'n.,* supra. In any proceeding the requirements which the Commission's actions must meet and the standards by which they are measured, depend on the character of the particular power being exercised in the matter at issue. *Monson,* supra; *Oklahoma Cotton Ginners' Ass'n.,* supra.

For example, in *Monson,* an action involving the drilling of salt water disposal wells, we recognized that when the Commission sits and decides matters in its adjudicative capacity, it exercises the power of a court of record pursuant to Okla. Const. Art. 9, § 19, and the Commission should therefore be treated as the "functional analogue of a court of record." We held that because the Commission's actions in question were a judicial function, the exemption accorded the judiciary in the Open Meeting Law would apply to the Commission. Likewise, in *Hair v. Okla. Corp. Comm.,* 740 P.2d 134 (Okla.1987), which involved a drilling and spacing order, we held that because the Commission is considered a court of record when it is performing in a judicial capacity, it may correct its orders by order nunc pro tunc.

 The proceeding at issue here, PUD–

---

advised a limited announcement pursuant to my commission responsibilities should have no adverse consequence on the FBI's investiga-

tion. I come forward at this time because the parties to cases at the Corporation Commission have rights which must be protected."

260, is a rate hearing.[2] The authority to establish rates for all public service corporations is exclusively vested in the Corporation Commission by Art. 9, § 18, of the Oklahoma Constitution. Rate hearings are legislative in nature, and SWB's assertion that this was a proceeding of a judicial nature is erroneous. *Turpen v. Oklahoma Corp. Comm.,* 769 P.2d 1309 (Okla.1989); *State, ex rel. Cartwright v. Southwestern Bell Tel. Co.,* 662 P.2d 675 (Okla.1983); *Chickasha Cotton Oil Co. v. Corp. Comm.,* 562 P.2d 507 (Okla. 1977); *Wiley v. Oklahoma Natural Gas Co.,* 429 P.2d 957 (Okla.1967).

When Anthony and his fellow Commissioners hear PUD–260 they will act in their legislative capacity. That distinction is determinative of the issue presented for, as discussed below, proceedings which are legislative in nature do not implicate judicial processes and do not require application of the judicial standards urged by SWB. More importantly, this Court has no power to grant the relief sought against constitutional officers acting in a legislative capacity.

In *Prentis v. Atlantic Coast Line,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), the Supreme Court of the United States was asked to determine whether the federal courts could enjoin the Virginia Corporation Commission from enforcing railroad rates alleged to be confiscatory. At issue was the nature of the challenged commission action. The Virginia constitutional provision (which is nearly identical to provisions of our article 9) invested the Commission with legislative, executive, and judicial powers. The Court assumed that while the Commission was for some purposes, a court, which would be protected from interference by federal courts, in setting the rates the Commission had acted in a legislative capacity and could therefore be enjoined. Speaking through Justice Holmes, the court analyzed the distinctions between legislative and judicial proceedings:

"A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind, ..."

The Court then made the point that:

"Proceedings legislative in nature are not proceedings in a court, * * * no matter what may be the general or dominant character of the body in which they may take place. * * * That question depends not upon the character of the body, but upon the character of the proceedings. * * * And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up ... The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law, he must know or discover the facts that establish the law. So, when the final act is legislative, the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case." 211 U.S. at 226–27, 29 S.Ct. at 69–70 (Citations omitted).

The Supreme Court of the United States has quite recently reaffirmed both the general mode of analysis used in *Prentis,* see *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75

---

2. PUD–260 began as an investigation into the effect of the Federal Tax Reform Act of 1986 on Oklahoma utilities. The initial Commission order was affirmed in part and reversed in part and remanded for further proceedings in *Henry v. Southwestern Bell,* 825 P.2d 1305 (Okla.1992). No argument is advanced here that this is not a rate hearing nor could such an argument be sustained, for the Court found in *Henry* that the rates charged were authorized and were not obtained by overcharging rate payers, and that the surplus cash at issue did not result from charges in excess of the legal rate. The Court specifically held at 1311 that the refund statute, 17 O.S.1991, § 121, was therefore not applicable to these facts and afforded no authority for requiring the refund sought by the parties.

L.Ed.2d 206 (1983) and the specific holding of *Prentis* that ratemaking is a legislative act and ratemaking proceedings are legislative in nature. See *Colorado Interstate Gas Co. v. Federal Power Comm.*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) and *New Orleans Public Service v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

We recognized and addressed the distinction between legislative and judicial functions in *Wiley v. Oklahoma Natural Gas*, 429 P.2d 957 (Okla.1967), where, in a case with some obvious factual similarities to the matter before us, we held the court was without power to declare rate increases void based on allegations that the Commission had been wrongfully influenced to approve them by contributions and favors from a lobbyist. The action was not an appeal from the amount of the rate as being either excessive or constitutionally confiscatory, only the decision making process was attacked. We stated:

"It is universally recognized that the fixing of rate schedules for public utilities is a legislative process, and that a public service regulatory body acts in a legislative capacity in approving rate schedules. It necessarily follows that a rate order is a legislative enactment and not a judgment of a Court. *Prentis v. Atlantic Coast Line*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150; *Pioneer T. and T. Co. v. State*, 40 Okl. 417, 138 P. 1033; 43 Am.Jur.Public Utilities and Services, Sec. 226; *City of Poteau v. American Indian Oil and Gas Co.*, 159 Okl. 240, 18 P.2d 523; *Ft. Smith and W. Ry. Co. v. State*, 25 Okl. 866, 108 P. 407; *Community Natural Gas Co. v. Corporation Commission*, 182 Okl. 137, 76 P.2d 393; *Western Oklahoma Gas and Fuel Co. v. State*, 113 Okl. 126, 239 P. 588. "In the last cited cases this Court said, at page 591 of the Pacific Reporter that 'in the last analysis an order of the Corporation Commission fixing rates is entitled to the same consideration as if the Legislature had fixed them * * *.'

"It is equally well settled that the judiciary cannot annul or pronounce void any act of the Legislature on any ground other than that of repugnancy to the constitution. Constitutionality of legislative acts is to be determined solely by reference to the limits imposed by the constitution. The Court may not inquire into the motives of the Legislature, as motives cannot be made a subject of judicial inquiry for the purpose of invalidating an act of the legislature." 429 P.2d at 958.

This recognition of the legislative nature of ratemaking proceedings and the resulting inapplicability of judicial concerns and standards, including due process notice and hearing requirements, has been repeatedly affirmed by this Court. In our recent decision in *State v. Southwestern Bell Tel. Co.*, 662 P.2d 675 (Okla.1983), we set forth and relied on the following statement from *Chickasha Cotton Oil Co. v. Corporation Commission*, 562 P.2d 507, 509 (Okla.1977):

"'We hold that the Corporation Commission was acting in a legislative capacity when it restructured the rates with which we are here concerned and was not required to give judicial due process notice and hearing to the Petitioners (users), unless specifically required by statute. There is no present statutory provision requiring notice.'

Accord, *State ex rel. Oklahoma Natural Gas Co. v. Hughes*, Okl., [204 Okla. 134] 227 P.2d 666 (669) (1951)."

See *Southern Oil Corp. v. Yale Natural Gas Co.*, 89 Okla. 121, 214 P. 131 (1923); *City of Bartlesville v. Corporation Commission*, 82 Okla. 160, 199 P. 396 (1921); *Chickasha Cotton Oil Co. v. Corporation Commission*, 562 P.2d 507 (Okla.1977); *State v. Southwestern Bell Tel. Co.*, 662 P.2d 675 (Okla.1983); *Henry v. Corporation Commission*, 825 P.2d 1262 (Okla.1992). See also, *Teleco, Inc. v. Southwestern Bell Telephone Co.*, 392 F.Supp. 692 (WD Okla.1974), *aff'd* 511 F.2d 949, *cert. denied* 423 U.S. 875, 96 S.Ct. 145, 46 L.Ed.2d 106 (1975).

 Based on the foregoing analysis we are convinced that SWB's position that this was a judicial proceeding where Commissioner Anthony was performing an adjudicatory function which demanded the application of due process requirements, including neutrali-

ty, is erroneous. Instead, PUD–260 was unarguably legislative in nature, and while participating in it Commissioner Anthony was acting in a legislative capacity which did not require him to comply with judicial standards of conduct. Accordingly, this Court is without jurisdiction to disqualify Commissioner Anthony from participation in this or any other SWB rate hearing.

■ Additionally, because of the legislative character of these proceedings, mandamus will not lie to compel Anthony's disqualification. As the terms of 12 O.S.1991, § 1451 make clear, mandamus will issue only where petitioner has a clear legal right to the relief sought and respondent has a plain legal duty which he refuses to perform. These requisites, together with inadequacy of other relief, must coincide to warrant issuance of the writ. *Oklahoma Gas & Electric Co. v. District Court,* 784 P.2d 61 (Okla.1989). Here, respondent has no legal duty to perform, and petitioner has no right to the relief sought. Neither is prohibition a proper remedy to reach an act which is legislative in nature. Prohibition will lie only where an inferior court or officer is acting in a judicial capacity exercising judicial or quasi-judicial power not granted by law or making an unauthorized or excessive application of judicial force. *James v. Rogers,* 734 P.2d 1298 (Okla.1987); *Stover v. Alfalfa County Election Board,* 530 P.2d 1020 (Okla.1975).

■ We are also unpersuaded by the additional argument urged by SWB that although the Corporation Commission is exempted from the provisions of Art. II of the Administrative Procedures Act, 75 O.S.Supp.1992, §§ 308a, et seq., we should nonetheless hold it bound by provisions of that article which impose certain due process requirements on agency proceedings, and especially by the terms of § 316 which call for the disqualification of agency members in some situations. That section provides:

"A hearing examiner or agency member shall withdraw from any individual proceeding in which he cannot accord a fair and impartial hearing or consideration. Any party may request the disqualification of a hearing examiner or agency member, on the ground of his inability to give a fair and impartial hearing, by filing an affidavit, promptly upon discovery of the alleged disqualification, stating with particularity the grounds upon which it is claimed that a fair and impartial hearing cannot be accorded. The issue shall be determined promptly by the agency, or, if it affects a member or members of the agency, by the remaining members thereof, if a quorum. Upon the entry of an order of disqualification affecting a hearing examiner, the agency shall assign another in his stead or shall conduct the hearing itself. Upon the disqualification of a member of an agency, the Governor immediately shall appoint a member pro tem to sit in place of the disqualified member in that proceeding. * * * "

The legislative nature of ratemaking ends any argument that the APA's standards of due process require treating the Commission the same as "other" agencies. Also, the Commission's constitutional creation distinguishes it from other administrative agencies which derive their authority "not from a direct constitutional grant but rather from statutory delegation." *Monson,* supra, at 842.

■ This statutory provision of directives for voluntary disqualification of agency members who sit by appointment and hearing officers who are agency employees together with a mechanism for their replacement, raise very different considerations from those presented by the situation before us. Here, we are asked to use the power of the judiciary to involuntarily disqualify an elected constitutional state officer in the absence of any constitutional or statutory provision allowing his disqualification or providing for a replacement. This Court has no power or authority to alter or interrupt the lawful term of Commissioner Anthony's office based on allegations of bias in a rate hearing where he is acting in his legislative capacity, and any attempt to do so would be an encroachment by the judiciary on both the legislative and executive powers.

■ In addition to establishing his powers and duties, the constitution and statutes fix Commissioner Anthony's term of office.

He is the legal incumbent and, pursuant to 51 O.S.1991, § 8, his office will not become vacant unless he should resign, die, move from the state, be convicted of certain offenses or be lawfully removed from office. *State. ex rel., Blankenship v. Freeman,* 440 P.2d 744 (Okla.1968). The law does not recognize "bias" as creating a vacancy and, as no vacancy established by law exists, there is none to fill. *Carpenter v. Carter,* 167 Okla. 238, 29 P.2d 83 (1934).

 Under Okla. Const. Art. 9, § 15 and 51 O.S.1991 § 10, the power to fill a vacancy in the office of Corporation Commissioner is placed in the governor. The law does not recognize a "temporary" vacancy as would result from a disqualification, however, as section 15 directs that the governor shall fill such vacancy by appointment until the next general election, when a successor shall be elected to fill out the unexpired term.

 The Court's lack of power to disqualify Commissioner Anthony from participation in SWB's rate hearing does not leave SWB defenseless and without a remedy for what it perceives as unfair treatment from a biased tribunal; SWB may appeal the Commission's rate order if it feels aggrieved by its provisions.

The denial of a fair rate of return resulting in confiscation of a utility's property is a constitutional concern of this Court. Okla. Const. Art. 9, § 20. After the ratemaking hearings on PUD–260 have concluded, if SWB believes that those Commission proceedings were so unfair because of Anthony's prejudice that the resulting rate order is unreasonable and confiscatory, it would be in a position to assert that bias as a ground for reversal of the rate order. A record of the proceeding would exist to support its contentions of unfair treatment and arbitrary rulings on evidence and testimony.

As is appropriate in reviewing an order of the Corporation Commission involving an asserted constitutional violation, this Court will exercise its independent judgment as to both the law and the facts. *Atchison, Topeka & Santa Fe Ry. Co. v. State,* 692 P.2d 554 (Okla.1984); *Application of Southwestern Bell Tel. Co.,* 575 P.2d 624 (Okla.1978). We

would therefore not be bound by the findings and conclusions of the Commission but would independently weigh the evidence in our determination of whether SWB had met its burden of proving the rates ordered by the Commission were confiscatory and fundamentally unfair.

### III.

We recognize that an argument could be made that the provisions of Art. 9, § 20 which grant this Court the power to issue writs of mandamus and prohibition to the Commission in a proper case, support the power of this Court to disqualify a corporation commissioner, if he were sitting in a *judicial* capacity.

In pertinent part, that section provides: "From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation, or any individual, person, firm, corporation, receiver or trustee engaged in the public utility business, an appeal may be taken by any party affected, or by any person deeming himself aggrieved by any such action, or by the State, directly to the Supreme Court of the State of Oklahoma,
. . .

. . . [I]n all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.

No court of this State, except the Supreme Court, shall have jurisdiction to review, affirm, reverse, or remand any action of the Corporation Commission with respect to the rates, charges, services, practices, rules or regulations of public utilities, or of public service corporations, or to suspend

or delay the execution or operation thereof, or to enjoin, reverse, or interfere with the Corporation Commission in the performance of its official duties; provided, however, *that writs of mandamus or prohibition shall lie from the Supreme Court to the Corporation Commission in all cases where such writs respectively would lie to any inferior court or officer."* [Emphasis Added]

While this provision does not alter the fact that extraordinary relief would not be available to disqualify Anthony while acting in his legislative capacity, see *Wilson & Co., Inc. v. Oklahoma Gas & Electric Co.,* 190 Okla. 528, 126 P.2d 1009 (1942); *Oklahoma Operating Co. v. Love,* 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920), it might be argued that it could extend this Court's supervisory control over the issue of his disqualification while exercising judicial power. In this application SWB seeks relief in all its pending and future Commission matters in addition to PUD–260. We are aware that some of these proceedings may be of a judicial nature, and disqualification of Commissioner Anthony in his judicial capacity may be sought.

 In an attempt to conserve judicial resources, as well as the resources of the rate payers, we observe in passing that while an attempt to disqualify Anthony in a proceeding involving a judicial function might arguably be cognizable, it would likely lead to the same result reached in this legislative function decision today: Commissioner Anthony would not be disqualified but would be allowed to continue to hear the matter despite assertions of bias and prejudice. This is so because the "rule of necessity", which would undoubtedly be held applicable, would require that Anthony not be disqualified because the concurrence of a majority of the Commissioners is necessary for a decision, and there is no mechanism in the law for appointment of a replacement commissioner. The rule of necessity is a common law rule recognizing that a judge should not be disqualified where his jurisdiction is exclusive or there is no provision for appointing a replacement so that his disqualification would deny the constitutional right to a forum. *United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). The rule has been held applicable to state administrative proceedings where the administrative body was acting in an adjudicatory capacity. *Barker v. Secretary of State's Office of Missouri,* 752 S.W.2d 437 (Mo.App.1988); *First American Bank & Trust Co. v. Ellwein,* 221 N.W.2d 509 (N.D.1974), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). It operates on the principle that "a biased judge is better than no judge at all" and the disqualification of a judge cannot be allowed to "bar the doors to justice or to destroy the only tribunal vested with the power" to hear the matter. *Barker,* supra, at 440.

A review by heightened scrutiny in the appellate court has been adopted as one means of compensation for any taint of bias that arises from a decision reached by an administrator who cannot be disqualified because of the rule of necessity. In *Barker v. Secretary of State's Office,* supra, the court considered a situation similar to the one before us in many respects other than the fact it involved an adjudicative process rather than a legislative one. There, Barker, an employee of the Secretary of State's office in Missouri, allegedly received a back injury at work and filed a workers compensation claim which was denied at trial. Representing Barker's employer at the trial was an assistant attorney general, Hannelore Fischer, who was later appointed to the Labor and Industrial Relations Commission which hears appeals from the workers compensation trial courts. This three-member commission ruled against Barker 2 to 1. Fischer took no part in the review until a stalemate occurred; her vote against Barker was the deciding one.

Barker then appealed the commission decision to the Missouri Court of Appeals arguing Fischer should have been disqualified. After a discussion of the rule of necessity, the appellate court determined that it must be applied in the case because the Commission is the only tribunal for review of workers compensation cases provided by Missouri law. The court further found that a valid decision by the commission must be by majority of two members and that no mechanism for substituting a disqualified member

existed. Hence, for the commission to perform its role of reviewing workers compensation cases, the rule required Fischer to sit and hear the matter, disagreeable as it may have been to Barker.

The appellate court determined that a heightened scrutiny on review was warranted, and stated:

> "This [consideration of the rule of necessity] does not, however, end our inquiry. We have agonized at great length to arrive at a fair and just solution to the problem posed by the unusual circumstances in the instant case. To this end we adopt the suggestion made by Professor Davis in his treatise on administrative law. Davis in his review of the law of necessity states:
>
>> The doctrine is so clear that it is seldom litigated, but when it causes results that are palpably unjust, perhaps it ought to be litigated, because ways can sometimes be found to relieve against the injustice. Whenever the rule of necessity is invoked and the administrative decision is reviewable, the reviewing court, *without altering the law about scope of review,* may and probably should review with special intensity.
>
> 3 K. Davis Administrative Law Treatise § 19.9 (2d ed.1980)
>
> The heightened scrutiny with which we review this case does not mean, however, that we are undertaking a de novo review. *Our scope of review is rigidly prescribed by statute and we will not stray out of the perimeters set for us by the legislature.*
>
> \* \* \* \* \* \*
>
> *Our review of this case rather, will be done with a more critical eye than is usual. The record will be thoroughly examined to determine if any injustice has been done to Barker given the circumstances present.* 752 S.W.2d at 441 (Emphasis added)."

If we applied the rule of necessity to a SWB adjudicatory matter with allegations similar to those urged here, it is likely that we would review the decision under a heightened appellate scrutiny or implement some other procedure to reach a just resolution of the competing interests involved in these strained circumstances.

We recognize that in a previous decision, *ETSI Pipeline Project, et al. v. Townsend,* Sup.Ct.No. 58,707, we granted a writ by unpublished order of September 9, 1982, disqualifying Commissioner Townsend from sitting in an adjudicative capacity. In that matter, however, no arguments were presented that the law did not provide for disqualification or replacement, and no argument as to the application of the rule of necessity was before us. This order is not precedent. To the extent, however, that it is or may be seen as conflicting with today's decision, it is expressly overruled.

**ORIGINAL JURISDICTION ASSUMED. PETITION FOR WRIT OF PROHIBITION DENIED. REHEARING GRANTED AND THE OPINION OF THE COURT ISSUED MAY 25, 1993 IS WITHDRAWN AND THIS OPINION IS ORDERED SUBSTITUTED THEREFOR.**

ALMA WILSON and WATT, JJ., and ADAMS and BOUDREAU, Special Justices, concur.

LAVENDER, V.C.J., and HARGRAVE, OPALA and KAUGER, JJ., dissent.

HODGES, C.J., and SUMMERS, J., disqualified.

OPALA, Justice, dissenting.

This quest by Southwestern Bell Telephone Company [SWB] for a neutral and detached tribunal *does not turn* on whether the Corporation Commission's [Commission] public utility ratemaking may be described as *"legislative"* but rather on (1) *what process is constitutionally due* the corporate owners (stockholders) of a public utility when the State, acting in the exercise of its ratemaking powers, seeks to affect their property interests and on (2) whether Oklahoma may withdraw from the Commission's *individual ratemaking*[1] the basic protections of due process

---

1. *Individual ratemaking* is agency action for the establishment of rates which is directed at particular parties. The agency ratemaking process is usually based on individualized fact-finding—i.e., that which affects particular individuals, their businesses, activities and properties. *See B.*

available to others by Art. II of the Oklahoma Administrative Procedures Act [APA][2] without violating either the Equal Protection Clause of the 14th Amend., U.S. Const.,[3] or the uniformity-of-procedure mandate in Art. 5, § 46, Okl.Const.[4]

*The court is clearly in error when it pronounces today that because the Commission's function of public utility ratemaking is "legislative", it goes unshielded by any form of due process.* Labeling ratemaking as legislative or adjudicative should be the beginning of today's inquiry into the reach of protections that are constitutionally due in an individual ratemaking proceeding. Like an ostrich that hides its head in sand to escape the unpleasant consequences of reality, the court today chooses to foist on Oklahoma *dated federal and state jurisprudence* long relegated to antiquarian lore by the more recent expressions from the U.S. Supreme Court.[5] The court's analysis, which begins and ends with reliance on first-generation federal cases, ignores a near-century of the most recent growth in the body of this Nation's constitutional law. That case law unequivocally teaches that ratemaking for application to a single public utility is clothed *with due process safeguards. Among those safeguards is the right to a neutral decisionmaker.*

I cannot accede to today's pronouncement that Commissioner Anthony may not be disqualified because he is acting in a legislative capacity. *The self-caponized court rests its powerlessness on a facial legal fallacy—its ipse dixit*[6] *that a legislator cannot be disqualified.* Our constitution, Art. 5, § 24,[7] clearly calls for legislative disqualification when a conflict of interest should arise. An elected executive official sitting as a legislative decisionmaker in an individual ratemaking proceeding in which he is required to utilize on-the-record adjudicative process should be no less vulnerable to disqualification than his counterpart in the legislature who is found to have a conflict of interest.

The court's opinion also contravenes this Nation's fundamental charter by imposing a dichotomous division of ratemaking procedures that offends equal protection. While individual ratemaking by an APA-governed agency[8] is explicitly governed by the Art. II's adjudicative process,[9] *it now becomes pure legislation* when the very same process occurs before the Commission. This unequal remedial treatment the court imposes today violates *with like force* the uniformity-of-procedure mandate found in Art. 5, § 46, Okl. Const.[10] When state law is bereft of authority necessary to carry out federal constitutional commands, the U.S. Constitution mandates that this court place the Commission

---

*Schwartz, Administrative Law* § 5.8, 237–240 (1991).

**2.** Ratemaking by agencies other than the Corporation Commission is explicitly excluded from Art. I rulemaking process (75 O.S.Supp.1992 § 250.3(2)(b), *infra* note 28) and hence must be deemed to fall under the Art. II adjudicative process (75 O.S.1991 §§ 309 et seq.).

**3.** For the pertinent terms of the Equal Protection Clause of the 14th Amend., § 1, U.S. Const., see *infra* note 97.

**4.** For the pertinent terms of Art. 5, § 46, Okl. Const., see *infra* note 110.

Because the APA expressly exempts the Commission from compliance with the adjudicative process of Art. II (75 O.S.Supp.1993 § 250.4(B)(4)), although Art. I regulates some of the agency's rulemaking aspects, the replacement mechanism in § 316 for disqualified agency decisionmakers is not *statutorily* applicable to members of the Corporation Commission (75 O.S.Supp.1993

§ 250.4(A)(2)). For the APA's Art. I rulemaking process, see 75 O.S.1991 §§ 250.2 et seq.

**5.** For detailed discussion of the discord between today's analysis and the current federal constitutional jurisprudence, see Part II, *infra*.

**6.** *Ipse dixit* is defined by Black's Law Dictionary, p. 743 (5th Ed.1979), as "a bare assertion resting on the authority of an individual."

**7.** For the terms of Art. 5, § 24, Okl.Const., see *infra* note 44.

**8.** An APA-governed agency is one whose adjudicative process must comply with the provisions of Art. II, 75 O.S.1991 §§ 309 et seq.

**9.** *Ratemaking is adjudication under the provisions of the APA,* 75 O.S.Supp.1992 § 250.3(2)(b). For the text of § 250.3(2)(b), see *infra* note 28.

**10.** For the pertinent terms of Art. 5, § 46, Okl. Const., see *infra* note 110.

under the (Art. II's) § 316[11] replacement mechanism of the APA.[12] In the alternative, a statutory replacement mechanism could be read into the provisions of Art. 6, § 13[13] and Art. 9, § 15, Okl. Const.,[14] construed together with 51 O.S.1991 §§ 8[15] and 10.[16]

I would declare that Commissioner Anthony is disqualified and that the state and federal fundamental law affords an effective post-recusal mechanism for replacing him as a disqualified commissioner.

# I

## RATEMAKING—BEFORE AND AFTER THE BIRTH OF AMERICAN ADMINISTRATIVE LAW

### A.

*Ratemaking As A "Legislative Function" Before The Birth Of Our Republic And Before The Advent Of State and Federal Administrative Law: The First– Generation Constitutional Teachings Of The U.S. Supreme Court*

The court's characterization of ratemaking as legislative[17] is of no moment in reaching *for the correct answer to today's question.* Ratemaking *was* the responsibility of the British Parliament before our tripartite division of government came into being.[18] In *Munn v. Illinois*[19] the U.S. Supreme Court recognized the English institutional scheme and saw *no* necessity to alter it for adaptation to our constitutional order.

The court today *begins and ends* its analysis with the landmark decision in *Prentis v. Atlantic Coast Line*[20] but ignores post-*Prentis* jurisprudential growth. *Prentis— Munn's* direct progeny—teaches that ratemaking lies in the legislative realm. This statement means little more than that, as a relic of our British heritage, the *function* is traditionally defined as *lawmaking. Munn* and *Prentis* are a first-generation exposition of our constitutional framework. The Oklahoma cases[21] on which the court relies in today's pronouncement *mirror our national law of yore*—the law when *Munn* and its *Prentis* progeny carried the day. The recent reference to *Prentis* in *New Orleans Public Serv. v. Council of New Orleans*[22] has *no* greater significance than that the Court still views *Prentis* as viable precedent on the

**11.** For the pertinent terms of 75 O.S.1991 § 316, see *infra* note 96.

**12.** For a discussion of the federal fundamental-law replacement mechanism, see Part III, *infra*.

**13.** For the pertinent terms of Art. 6, § 13, Okl. Const., see *infra* note 116.

**14.** For the pertinent terms of Art. 9, § 15, Okl. Const., see *infra* note 115.

**15.** For the pertinent terms of 51 O.S.1991 § 8, see *infra* note 118.

**16.** For the pertinent terms of 51 O.S.1991 § 10, see *infra* note 119.

**17.** For this notion, the court relies today on *Prentis v. Atlantic Coast Line*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), and on its *Oklahoma echo* in *Henry v. Corporation Com'n*, Okl., 825 P.2d 1262, 1266 (1992); *State ex rel. Cartwright v. Southwestern Bell Tel. Co.*, Okl., 662 P.2d 675, 681 (1983); *Chickasha Cotton Oil Co. v. Corp. Comm.*, Okl., 562 P.2d 507, 509–510 (1977); *Wiley v. Oklahoma Natural Gas Co.*, Okl., 429 P.2d 957, 958 (1967); *Southern Oil Corporation v. Yale Natural Gas Co.*, 89 Okl. 121, 214 P. 131, 135 (1923); *City of Bartlesville v. Corporation Commission*, 82 Okl. 160, 199 P. 396, 398 (1921); *see also Teleco, Inc. v. Southwestern Bell* *Telephone Co.*, 392 F.Supp. 692, 698 (W.D.Okl. 1974), *aff'd.* 511 F.2d 949, *cert. denied* 423 U.S. 875, 96 S.Ct. 145, 46 L.Ed.2d 106 (1975).

**18.** Before the founding of our Nation, the English Parliament set rates and tariffs by acts. *See Munn v. Illinois*, 94 U.S. 113, 123–124, 24 L.Ed. 77, 83–84 (1876), for a discussion of the extensive British and American antecedents in legislating specific rates for firms "affected with a public interest." *See also* CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES (Public Utilities Reports, Inc., 1988) at 81–85 and 117–123.

**19.** *Munn, supra* note 18, 94 U.S. at 125–126, 24 L.Ed. at 84.

**20.** *Supra* note 17, 211 U.S. at 226–227, 29 S.Ct. at 69.

**21.** For Oklahoma decisional law, see *supra* note 17.

**22.** In *New Orleans Public Serv. v. Council of New Orleans*, 491 U.S. 350, 371, 109 S.Ct. 2506, 2520, 105 L.Ed.2d 298 (1989), the Court observes that it has "reaffirmed both the general mode of analysis of *Prentis* ... and its specific holding that ratemaking is an essentially legislative act."

*essence* of ratemaking function rather than on the *procedural characteristics* of the individual ratemaking process.

While the concept of ratemaking as a legislative function has not been disturbed by the American constitutional order, *post–Prentis jurisprudence has superimposed upon its framework a host of due process protections.*[23] *Participation by a neutral and detached decisionmaker is one of several essential elements of due process which has been* applied *to individual ratemaking.*[24] The early-day English characterization of ratemaking as legislative [25] no longer *defines the essence* of the process in the context of safeguards extended by our Constitution.[26] Neither can this historical label *alone determine* the kind of process that is a *public utility's due today.*[27] By *characterizing the Commission's public utility ratemaking as legislative,* in the sense of *Munn* or *Prentis,* and then stopping its analysis, the court today

**23.** The Due Process Clause of the 14th Amend., U.S. Const., commands that no State shall "deprive any person of life, liberty, or property, without due process of law...." For a discussion of the procedural due process guarantees, see Part II, *infra.*

**24.** *See, e.g., Northwestern Bell Tel. v. Stofferahn,* 461 N.W.2d 129, 133 (S.D.1990) (the court applied *the due process neutrality mandate* in an *individual utility rate case*). In *Association of Nat. Advertisers, Inc. v. F.T.C.,* 627 F.2d 1151 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980), the association sought to prohibit the Federal Trade Commission chairman from participating in pending rulemaking proceedings. Although concluding that the commissioner was not disqualified, the court opined that *the parties in a rulemaking setting "have a right to a fair and open proceeding; that right includes access to an impartial decisionmaker." Id.* at 1174 (emphasis supplied). *See also Tennessee Cable TV v. Public Service Com'n,* 844 S.W.2d 151, 164–166 (Tenn.App. 1992) (the court applied the neutrality mandate in a general ratemaking case).

**25.** There is an analogy between the power of the British Parliament over ratemaking and its divorce jurisdiction of yore. Like ratemaking, divorce *a vinculis lay* within the authority of Parliament, which *also* functioned as a court of law. American legislatures succeeded to the Parliament's power despite their different status in the structure of government. Schwartz, *supra* note 1, § 2.27 at 94. After the U.S. Constitution had established a tripartite division of our national government, the Supreme Court did not reallocate ratemaking to make it coincide more closely with our separation-of-powers doctrine. *See in this connection Maynard v. Hill,* 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888), where the Court noted that the legislative assemblies of the colonies followed the example of Parliament by treating divorce judicature as within their power. The Court has refused to hold that legislatively pronounced divorces offend our concept of separation of powers. Another function performed by Parliament was chartering of corporations. A company could apply to the Crown for a charter of incorporation *or could incorporate by an act of Parliament.* Max Radin, Anglo-American Legal History at 482, 513 n. 26 (1936). *No one could*

today contend with any hope of persuasion that because some function lay within Parliament's yesteryear's prerogative, it must now be placed beyond due process protection.

**26.** In *United States v. Brewster,* 408 U.S. 501, 508, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972), the Court made a similar analysis of the Speech or Debate Clause (Art. I, § 6, U.S. Const.). There, the Court noted that although the clause's historic roots are in English history, its text must be interpreted, not *against the backdrop of the English system* in which Parliament is not a coordinate branch but the supreme authority ("the highest court in the land"), but rather in light of the American experience as well as in the context of this Nation's *constitutional design. Id.,* 408 U.S. at 508, 92 S.Ct. at 2540.

**27.** As Justice Stevens notes in *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 686, 96 S.Ct. 2358, 2368, 49 L.Ed.2d 132 (1976) (Stevens, J., dissenting), when the Court examines "a state procedure for the purpose of deciding whether it comports with the constitutional standard of due process, the fact that a State may give it a 'legislative' label should not save an otherwise invalid procedure." *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969), similarly teaches *that historical labels do not define the limits of due process protections.* Just because the English tradition militates in favor of dispensing with a hearing does not necessarily render the practice conformable to *our notions of due process.* In Supreme Court of *Virginia v. Consumers Union, etc.,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), the Court shifted its § 1983 (42 U.S.C. § 1983) immunity focus from the *description of the official*—judge, legislator, executive— to the *functional analysis* of what that official was doing when the harm came to be inflicted. If the legislator was hiring and firing, the immunity was that of an executive; but if a legislator or judge was engaged in lawmaking (or the judge in adjudication), absolute immunity applied. *The same kind of analysis is required by the Court's current constitutional jurisprudence for today's assessment of what process in ratemaking is a public utility's due. Davis v. Passman, infra* note 57.

*arrests* our jurisprudence at its turn-of-the-century stage of development, *ignoring entirely a whole century's growth of due process.*

## B.

### Ratemaking After The Birth Of Administrative Law

The administrative process of American law distinguishes between *rulemaking* and *adjudication.* A "rule" is the product of administrative *legislation.*[28] Rulemaking process[29] is hence the administrative counterpart of legislative lawmaking.[30] In contrast, an "order" is the product of administrative *adjudication.*[31] Adjudicative process is the administrative equivalent of a court's judicature.[32]

To implement the U.S. Supreme Court's second-generation constitutional teachings,[33] the Oklahoma APA *explicitly excised from the Art. I rulemaking rubric the process of prescribing rates.*[34] The Model State Administrative Procedures Act [MSAPA] treats ratemaking determinations of *particular applicability*[35] *as orders* subject to the model

---

**28.** The Oklahoma APA, 75 O.S.Supp.1992 § 250.3(2), defines the term "rule" as:

"any agency statement or group of related statements of general applicability and future effect that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of the agency. The term 'rule' includes the amendment or revocation of an effective rule but *does not include:*

a. the issuance, renewal, denial, suspension or revocation or other sanction of an individual specific license,

b. the *approval, disapproval or prescription of rates.* For purposes of this subparagraph, the term 'rates' shall not include fees or charges fixed by an agency for services provided by that agency including but not limited to fees charged for licensing, permitting, inspections or publications, * * * " (Emphasis added.)

**29.** "Rulemaking" under the APA (Art. I) "means the process employed by an agency for the formulation of a rule...." 75 O.S.Supp.1992 § 250.3(4).

**30.** 75 O.S.Supp.1992 § 250.3(2)(b), *supra* note 28.

**31.** An "order" is defined by the APA, 75 O.S.Supp.1992 § 250.3(5), as "all or part of a formal or official decision made by an agency including but not limited to the final agency orders." In the 1981 Model State Administrative Procedures Act the word "order" includes every agency action that determines any of the legal rights, duties, privileges, or immunities of an *identified individual or individuals.* For the difference between "rules" and "orders", see *Texas County Irr. & Water v. Okl. Water,* Okl., 803 P.2d 1119, 1121 (1991).

**32.** In individual proceedings an agency deals with adjudicative, *not legislative, facts.* For the distinction between legislative and adjudicative facts, see *State v. Freeman,* Okl., 440 P.2d 744 (1968).

"Facts to which the law is to be applied in the process of adjudication are called *adjudicative*

facts. These are facts *'about the parties'.* They must be ascertained from formal proof and are to be distinguished from 'legislative facts', or those which are helpful to a court in determining the meaning, effect, content or validity of enactments. *Legislative facts,* which *are ordinarily general in nature,* may be noticed from official source materials, whether or not they have been formally developed on the record in a judicial proceeding."

*Id.,* 440 P.2d at 757–758 (emphasis added). *Individual ratemaking requires finding facts for application to particular business operations.*

**33.** For a discussion of the U.S. Supreme Court's *second-generation* constitutional teachings, see Part II, *infra.*

**34.** Oklahoma's APA version presently in force *explicitly* classifies ratemaking as adjudication. The terms of 75 O.S.Supp.1992 § 250.3(2)(b), *supra* note 28, provide in part that the "term 'rule' ... *does not include:* * * * the *approval, disapproval or prescription of rates.* * * * " (Emphasis added.)

**35.** *Adapting* the MSAPA to the mid-twentieth-century metamorphosis imposed by the federal constitutional jurisprudence, the Commissioners on Uniform State Laws took ratemaking out of rulemaking in the 1946, 1961 and 1981 versions of the model act. The 1946 MSAPA version *implicitly* included ratemaking in the definition of "contested case," which was *then* defined as a "proceeding before an agency in which the legal rights, duties, or privileges *of specific parties are required by law or constitutional right to be determined after an agency hearing."* The 1961 version (adopted with modification in Oklahoma), *specifically* included ratemaking in the definition of "contested case"—i.e., "a proceeding, including but not restricted to ratemaking." The 1981 version *implicitly* includes ratemaking (for a single utility) within the definition of "order"—i.e., "an agency action of *particular applicability* that determines the legal rights ... of one or more specific persons." In contrast, both the 1961 and 1981 versions define the term "rule" as an

act's adjudication provisions. Even the federal government—which generally continues to regard ratemaking as rulemaking [36]—has placed *individual ratemaking* into a special category called *on-the-record rulemaking.*[37] This phrase gives recognition to the *new constitutional verity*—i.e., *that the legislative process of individual ratemaking requires*

agency statement *"of general applicability"* that implements, interprets, or prescribes law or policy, or the organization, procedure, or practice requirements of an agency. *See* ARTHUR EARL BONFIELD, STATE ADMINISTRATIVE RULE MAKING, § 3.3.1 at 75–76 (1986) (Professor Bonfield served as one of the two reporter-draftsmen for the 1981 MSAPA for the National Conference of Commissioners on Uniform State Laws). At the time of *Prentis* the distinction between *agency ratemaking and agency adjudication* had not yet been crafted. *The changes in the MSAPA give eloquent testimony to the new place individual ratemaking has come to occupy in the post-Prentis administrative remedial regime.*

**36.** 5 U.S.C. § 551(4).

**37.** 5 U.S.C. §§ 551(4), 553(c). Two types of rulemaking are recognized under the Federal Administrative Procedures Act [FAPA]: *informal* and *formal rulemaking.* 5 U.S.C. §§ 553–557. Informal rulemaking—commonly called notice-and-comment—is governed *only* by the FAPA requirements of notice and opportunity for interested parties to comment or otherwise participate. 5 U.S.C. § 553. *Formal rulemaking takes place when rules must be preceded by a "trial-type" hearing.* 5 U.S.C. §§ 554, 556, 557. A statutory requirement that rules are to be made *on the record after opportunity for an agency hearing* that triggers the process of formal rulemaking—i.e., *rulemaking-upon-a-record.* 5 U.S.C. §§ 556, 557.

**38.** Professor Bonfield comments that because some pre–FAPA federal cases treated ratemaking as rulemaking for *certain* purposes, the FAPA classified *all* ratemaking as rulemaking, whether of general or of particular applicability. BONFIELD, *supra* note 35, § 3.3.3(a) at 77–78, citing *Prentis, supra* note 17, 211 U.S. at 226, 29 S.Ct. at 69. Bonfield observes that the FAPA, in combination with the enabling acts of various federal agencies engaged in *individualized ratemaking,* subjected ratemaking of *particular applicability to most of the adjudicative procedures of the FAPA. See, e.g.,* 5 U.S.C. §§ 551(4), 553(c). BONFIELD, § 3.3.3(a) at 77–78. Once a rate is challenged under the federal scheme, the relevant statutes of the federal agencies *require* that the rate be evaluated in a "hearing". *See, e.g.,* (1) Federal Energy Regulatory Commission [FERC], 15 U.S.C. § 717c(e) (1984) (gas pipeline rates) and 16 U.S.C. § 824d(e) (electric); (2) Federal Communications Commission [FCC], 47 U.S.C.A. § 204(a) (Cum.Cupp.1993); (3) Inter-

*adversarial, trial-type hearings.*[38] On-the-record rulemaking is now acknowledged to be surrounded by a host of due process safeguards.[39]

A recent commentator *captured the essence of ratemaking* in this eloquent distillate: Ratemaking, while legislative in character,[40]

state Commerce Commission [ICC], 49 U.S.C.A. § 10704(a) (railroad) and 49 U.S.C. § 10708(a)(2) (motor carriers); (4) Civil Aeronautics Board [CAB], 49 U.S.C. § 1482(g). The basic format of a rate investigation hearing is that of a traditional adversary hearing. *See, e.g.,* (1) CAB—14 C.F.R. §§ 302.24, .500–.508; (2) FPC—18 C.F.R. §§ 1b.1–.20; (3) FCC—47 C.F.R. §§ 1.201–.364 (1992). *See generally,* Morgan, *Toward A Revised Strategy For Ratemaking,* 1978 Law Forum 21.

**39.** Professor Davis notes that *"for all practical purposes,* rules 'made on the record' *are the equivalent of rules 'made through trial procedure.' "* (Emphasis supplied.) KENNETH CULP DAVIS, 1 ADMINISTRATIVE LAW TREATISE, § 6.3 at 455 (1978). One commentator observes that *"an* inference that protected objectivity in *some* measure is required [by the FAPA] could be drawn from statutes requiring use of trial-type procedures to a greater or lesser degree." Peter L. Strauss, Disqualifications of Decisional Officials in Rulemaking, 80 Colum.L.Rev. 990, 1048 (1980).

**40.** In *Bi–Metallic Inv. Co. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915), Justice Holmes (the author of *Prentis, supra* note 17) explains that "due process" safeguards are *not triggered* when "a rule of conduct applies to *more than a few people* [because] it is impracticable that everyone should have a direct voice in its adoption." (Emphasis added). When "a relatively small number of persons was concerned," Justice Holmes notes, "due process" must be afforded. *Id.* 239 U.S. at 445–46, 36 S.Ct. at 142–43. *See also Dent v. State of West Virginia,* 129 U.S. 114, 124, 9 S.Ct. 231, 234, 32 L.Ed. 623 (1889) (legislation comports with due process if, among other things, *"it be general in its operation upon the subjects to which it relates....")* (Emphasis added). Justice Blackmun, concurring in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), used the rationale in *Bi–Metallic* and *Dent* to support his conclusion that 180 patients in a nursing home were not deprived of "due process". He also made clear that "the case for *due process protection grows stronger as the identity of the persons affected by the government choice becomes clearer; and the case becomes stronger still as the precise nature of the effect on each individual comes more determinately within the decision maker's pur-*

**1016**

"is normally *particular in applicability* since it involves the fixing of prices to be charged by utilities or carriers. When an agency fixes the rates charged by an electric utility, where there is only one company whose rates are being fixed, the impact on that company is *virtually that of a judicial decision*, and it has a *due process right to be heard.* ˙ Regardless of its theoretical legislative nature, the proceeding is an adversary one, with the company and the agency as opposing parties who can best present their sides in a trial-type format." [41]

In sum, rules are agency directives of *general applicability* which are designed *to apply across the board to all regulated entities.* Ratemaking, although historically termed nonadjudicative, generally calls for *particularized applicability and trial-type hearings.* With the post-*Prentis* march of due process, today's *individual ratemaking*—gradually

transformed for conformity to the adjudicative process—no longer fits under the *general rubric of lawmaking (or rulemaking).* [42] The present-day acceptance of individual ratemaking as "adjudication" or as "on-the-record rulemaking" is but current recognition—by *both* the federal and state administrative law systems—that ratemaking of particularized applicability has indeed become *sui generis*—a *genre* of legislation that bears procedural characteristics which implicate due process. The essence of business profitability, the extent of capital investment, and the return rate for each utility, are *elements of proof,* all of which call for *a different analysis* and for a different fact finding process (for individual ratemaking) from that of *ordinary* general rulemaking. *It is for this reason that individual ratemaking inquiry must be surrounded with the full panoply of due process guarantees.* [43]

*view." Id.,* 447 U.S. at 800–01, 100 S.Ct. at 2483, quoting L. Tribe, American Constitutional Law § 10–7 at 503–504 (1978) (emphasis added).

**41.** Schwartz, *supra* note 1, § 5.8 at 239 (1991) (emphasis added). But Schwartz goes on to say that the same is not true *when rates are general* rather than *particular in applicability. Id.* at 239. Federal courts have noted *the difference* between a *legislative* deprivation that requires no due process and one that is *judicial* which mandates application of the due process safeguards. *See Richardson v. Town of Eastover,* 922 F.2d 1152 (4th Cir.1991) ("While a legislative enactment is one adopted *generally for all citizens in a particular classification* [citing as an example *Bi-Metallic, supra* note 40], when a rule adopted for general application *applies only to a small number of persons, its characterization as legislation becomes suspect." Id.* at 1158, (emphasis added)); *County Line Joint Venture v. Grand Prairie, Texas,* 839 F.2d 1142 (5th Cir.1988) ("Conduct of a municipal body is likely to be *deemed legislative when an elected group, such as a city council, makes a general zoning* decision which applies to *a large group of interests.* Conversely, a municipal body's action may be more likely termed *adjudicative if an appointed group such as a zoning board, makes specific decisions regarding a specific piece of property." Id.* at 1144, (emphasis added)). For the same rationale, see *Hoffman v. City of Warwick,* 909 F.2d 608, 619–21 (1st Cir.1990); *United States v. LULAC,* 793 F.2d 636, 648 (5th Cir.1986); *Buford v. Holladay,* 791 F.Supp. 635, 643–44 (S.D.Miss.1992). Leading commentators also agree that for administrative agencies which possess both legislative and judicial powers, "due process" safeguards are invoked when a small class is affected by the

agency action *despite the characterization given to that action by the agency. See* R. Rotunda & J. Nowak, Treatise on Constitutional Law: Substance and Procedure, § 17.8, p. 646 (2d Ed.1992); Tribe, American Constitutional Law, § 10.7, p. 667 (2d Ed.1988).

**42.** At the time of *Prentis, supra* note 17, the Court had yet to craft a distinction between administrative *rulemaking* (as lawmaking) and administrative *adjudication.* Citing *Prentis,* Professor Davis notes that in the early 1900's the Court "was unsoundly trying to determine the appropriate procedure" in agency proceedings by characterizing them as either legislative or judicial. Davis, *supra* note 39 at 322. He observes that the "move in the thinking of both judges and administrators is away from the idea that adjudication calls for one procedure and that rulemaking calls for another procedure." Courts " *now tend to look to the particular task that an agency is performing in an adjudication or in rulemaking in determining what is the required procedure." Id.* at 324 (emphasis added).

**43.** In *United States v. Florida East Coast Railway Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973), an Interstate Commerce · Commission ratemaking case, the Court held that when agency action is directed at "a very small number of persons [who are] exceptionally affected," it constitutes adjudication and due process attaches, but when the same agency action is "applicable across the board" to all utility companies it is rulemaking in its purest form with no due process implications. *Id. See also, Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519,

## C.

### *A Self–Caponized Court Rests Its Powerlessness On A Facial Legal Fallacy*

It is plain legal *non sequitur* to say that Commissioner Anthony cannot be disqualified because he is acting in a legislative capacity. The concept of legislative disqualification is intrinsic in our fundamental law. In the context of a legislator's conflict of interest, the terms of Art. 5, § 24, Okl. Const.,[44] mandate that an affected member abstain from voting in any matter, proposed or pending. This constitutional disqualification is judicially enforceable.[45] A legislator found to be disqualified within the meaning of § 24 could be compelled to desist from voting. *An elected executive official sitting as a legislative decisionmaker in an individual ratemaking proceeding should be no less vulnerable to disqualification than his counterpart in the legislature when the latter is found to have a conflict of interest.*

## II

### TODAY'S PRONOUNCEMENT CONTRAVENES STATE AND FEDERAL

## DUE PROCESS NORMS BY WITHDRAWING FROM THE COMMISSION'S INDIVIDUAL RATEMAKING AN ESSENTIAL ELEMENT OF DUE PROCESS—THAT OF A NEUTRAL AND DETACHED DECISIONMAKER

### A.

### *Both Legislative And Executive Functions Are In Some Aspects Governed By Various Forms Of Due Process*

This Nation's constitutional jurisprudence teaches that, when the State seeks to affect *a protected liberty or property interest,* due process *applies not just in courts but to the other functions of government* as well.[46]

(1). *The Executive Department.* A prisoner has a due process right to "an adversary executive hearing" before revocation of parole [47] or probation,[48] rescission of "good-time credits" [49] and before an involuntary transfer to a state mental hospital.[50] Due process also attaches in other areas of governmental regulation: food stamp reductions; [51] termination of welfare benefits; [52] exclusion of a permanent resident alien who is attempting to reenter the United States; [53] a public job termination; [54] and license revoca-

---

542, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978); Schwartz, *supra* note 1, § 5.9, at 241–242.

**44.** The terms of Art. 5, § 24, Okl.Const., are: "A member of the Legislature, who has a personal or private interest in any measure or bill, proposed or pending before the Legislature, shall disclose the fact to the House of which he is a member, and shall not vote thereon."

**45.** Although there is no Oklahoma authority construing Art. 5, § 24, Okl. Const., it is apparent from the jurisprudence of other states (with similar or virtually identical provisions) that this constitutional mandate is judicially enforceable. *See, e.g., Kremer v. Barbieri,* 48 Pa.Cmwlth. 557, 411 A.2d 558, 561 (1980); *Opinion of the Justices No. 317,* 474 So.2d 700, 702 (Ala.1985).

**46.** In *Mooney v. Holohan,* 294 U.S. 103, 113, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), the Court observes that the 14th Amendment *"governs any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers."* (Emphasis supplied.)

**47.** Once a state grants a prisoner conditional liberty dependent on the observance of special parole restrictions, due process protections attach in proceedings to revoke that liberty interest. *Morrissey v. Brewer,* 408 U.S. 471, 487–489,

92 S.Ct. 2593, 2603–2604, 33 L.Ed.2d 484 (1972).

**48.** *Gagnon v. Scarpelli,* 411 U.S. 778, 791, 93 S.Ct. 1756, 1764, 36 L.Ed.2d 656 (1973).

**49.** *Wolff v. McDonnell,* 418 U.S. 539, 554, 94 S.Ct. 2963, 2973, 41 L.Ed.2d 935 (1974); *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Ponte v. Real,* 471 U.S. 491, 498–499, 105 S.Ct. 2192, 2197, 85 L.Ed.2d 553 (1985).

**50.** *Vitek v. Jones,* 445 U.S. 480, 487–489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980).

**51.** *Atkins v. Parker,* 472 U.S. 115, 128, 105 S.Ct. 2520, 2528, 86 L.Ed.2d 81 (1985).

**52.** *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970).

**53.** *Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982).

**54.** *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) (the due process challenges of discharged Central Intelligence Agency employee are reviewable).

tion.[55] The due process guarantee may be violated by unfairness or corruption of officers in the performance of administrative functions.[56]

(2). *The Legislative Department.* Legislative action is not beyond the reach of due process if the implicated interests mandate that certain safeguards be accorded. The anti-discrimination component of the 5th Amendment applies to a congressman's hiring and firing practices.[57] Due process has also found its way into congressional hearings where the Congress or a state legislature attempts to hold one of its members in contempt and to certify that member for trial in the courts.[58]

## B.

### *The Due Process Mandate For Neutral Decisionmakers Governs A Host Of Proceedings Before The Executive And Legislative Organs of Government*

*Due process of law fundamentally requires a fair hearing before a fair tribunal.*[59] Fairness against governmental deprivation of an individual's property or liberty interest is ensured by procedural safeguards[60] when

**55.** In *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), the Court upheld the lower court's finding that members of the state optometry board had sufficient pecuniary interest in reducing competition to disqualify them from participating in the license revocation hearings. The Court held that an optician licensing board whose members were drawn wholly from one wing (self-employed practitioners) of the occupation could not itself adjudicate unprofessional conduct charges brought against the other wing (commercially or non-self-employed practitioners). The Court based this holding on the premise that the monetary gain to the self-employed practitioners would unfairly infect their decisional processes.

**56.** *Norris v. State of Alabama,* 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935); *Mooney, supra* note 46, 294 U.S. at 112–113, 55 S.Ct. at 341–342. The Court has recognized that administrative officers, when executing the provisions of a statute dealing with the liberty of persons, have no right to disregard the fundamental principles that inhere in due process of law. *Kaoru Yamataya v. Fisher,* 189 U.S. 86, 99–100, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903).

**57.** *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). *Davis* teaches that the Due Process Clause of the 5th Amendment gives congressional employees the right to be free from official discrimination. The Court held that a woman discharged from employment by a congressman because of her gender has standing to bring an action against him.

**58.** *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (the Georgia House of Representatives acted unconstitutionally when it excluded Julian Bond because of his statements criticizing the federal government's policy in Vietnam); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (the U.S. House of Representatives acted unconstitutionally when it effectively expelled Adam Clayton Powell by a majority vote because of charges that he had misappropriated public funds and abused the process of the New York courts). *See also*

*Miller v. Town of Hull, Mass.,* 878 F.2d 523 (1st Cir.1989) (the town board of selectmen violated the due process rights of members of the town redevelopment authority by removing them because of a position they took with respect to a housing project for the elderly); *Kucinich v. Forbes,* 432 F.Supp. 1101 (N.D.Ohio 1977) (Councilman Kucinich had been punished for the exercise of his right of free speech when the Cleveland City Council suspended him on the charge that he had slandered the council president in a statement on the floor of that body).

**59.** For the pertinent terms of the Due Process Clause of the 14th Amend., U.S. Const., see *supra* note 23. No matter how complete the panoply of procedural devices which protect a particular liberty or property interest, due process requires that those procedures be neutrally applied. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). "Of all the values informing the due process guarantee, the perception-of-fairness value most clearly dictates use of a truly independent adjudicator. Whether or not it can be proven that a particular decisionmaker allows her personal interests to sway her resolution of a dispute, the perception-of-fairness value demands that she be enjoined from deciding the case if she has some identifiable *potential* bias. Few situations more severely threaten trust in the judicial process than the perception that a litigant never had a chance because the decisionmaker may have owed the other side special favors." M.H. Redish and L.C. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 483 (1986).

**60.** Due process includes several procedural guarantees: (1) adequate notice of the charges or basis for government action; (2) a neutral decisionmaker; (3) an opportunity to make an oral presentation to the decisionmaker; (4) an opportunity to present evidence or witnesses to the decisionmaker; (5) a chance to confront and cross examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the deci-

proper notice and opportunity to be heard are afforded.[61] *One of the integral elements of due process is an individual's right to be heard by a neutral and detached decisionmaker.[62] That element is not constitutionally reserved for exclusive application to adjudicative proceedings. The neutrality mandate extends not only to judges but also to agency decisionmakers.[63]* The neutral examiner concept is deeply engrained in Anglo–American jurisprudence. It came into the fabric of our fundamental law long before the Warren era [64] and has been consistently enforced *sans* aberrational departure.[65] Due

sionmaker; and (7) a decision based on the record with a statement of reasons for the decision. Additionally, there are six other procedural safeguards which tend to appear only in connection with criminal trials or formal judicial process of some type. Those are: (1) the right to compulsory process of witnesses; (2) a right to pre-trial discovery of evidence; (3) a public hearing; (4) a transcript of the proceedings; (5) a jury trial; and (6) a burden of proof on the government greater than a preponderance of the evidence standard. *See* ROTUNDA & NOWAK, *supra* note 41, § 17.8, at pp. 644–45; Henry J. Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1279–1292 (1975).

**61.** *Goldberg, supra* note 52. Our Due Process Clause, Art. 2, § 7, Okl. Const., has a definitional sweep that is co-extensive with its federal counterpart. The terms of Art. 2, § 7, Okl. Const., are: "No person shall be deprived of life, liberty, or property, without due process of law." *Messenger v. Messenger*, Okl., 827 P.2d 865, 872 (1992); *Fair Sch. Finance Coun. of Okla. v. State*, Okl., 746 P.2d 1135, 1148 n. 48 (1987); *Matter of Rich*, Okl., 604 P.2d 1248, 1250–1251 (1979); *McKeever Drilling Co. v. Egbert*, 170 Okl. 259, 40 P.2d 32, 35 (1935). *See Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), citing *Baldwin v. Hale*, 68 U.S. 223, 17 L.Ed. 531 (1864), and *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

**62.** *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927), arose out of a conviction in a mayor's court for violation of state prohibition laws. In addition to his regular income, the mayor-judge shared in the fees and costs levied against convicted violators. The Court held that due process is violated when a decision is made by "a court, the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against" the defendant. *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972), dealt with traffic convictions in a mayor's court. The mayor-judge was responsible for village finances; and the mayor's court, through fines, forfeitures, costs and fees, supplied a major part of the village's revenue. The system was challenged because it denied the defendant a trial before a disinterested and impartial judicial officer, contrary to the guarantee of due process.

**63.** *Administrative decisionmakers must be as neutral and detached as a judge is called upon to be by the applicable standards of federal due process.* In *Gibson, supra* note 55, 411 U.S. at 579, 93 S.Ct. at 1698, the Court states:

"It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. *Tumey v. Ohio [supra,* note 62].... And *Ward v. Village of Monroeville [supra,* note 62], indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey.* It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest *applies with equal force to ... administrative adjudicators.'* K. Davis, Administrative Law Text § 12.04, p. 250 (1972), and cases cited." (Emphasis added.) *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). In *Friedman v. Rogers,* 440 U.S. 1, 18, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979), the Court notes that Rogers, an optometrist, has "a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him by the Board [of Optometry]." *Id.,* citing *Gibson, supra* note 55. Due process will be applied before the Corporation Commission. Agencies not governed by the APA's Art. II adjudicative process, 75 O.S. 1991 §§ 309 et seq., are nonetheless bound by those portions of that Article which embrace due process concepts. *C.F. Braun & Co. v. Corporation Commission,* Okl., 609 P.2d 1268, 1273–1274 (1980); *Teleco, Inc. v. Corporation Com'n,* Okl., 653 P.2d 209, 214 (1982); *Harry R. Carlile Trust v. Cotton Petroleum,* Okl., 732 P.2d 438, 442–443 n. 21 (1987); *Amoco Production v. Corp. Com'n of Okl.,* Okl.App., 751 P.2d 203, 207 (1986); *State ex rel. Henry v. Southwestern Bell,* Okl., 825 P.2d 1305, 1317 (1992); *Lincoln Bank and Trust v. Tax Com'n,* Okl., 827 P.2d 1314, 1319 (1992); *see also* Art. 9, § 19, Okl.Const.; *Monson v. State ex rel. Okl. Corp. Com'n,* Okl., 673 P.2d 839, 842 (1983).

**64.** *Tumey, supra* note 62.

**65.** *Ward, supra* note 62; *Coolidge v. New Hampshire,* 403 U.S. 443, 449–453, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), teaches that the neutrality element of due process is as applicable to adjudication by a nonjudicial tribunal as it is to the adjudicative process of a court. *Coolidge* required a neutral person for a *nonadversarial ex parte proceeding to issue a search warrant.* The New Hampshire attorney general was not considered a neutral and detached officer *for this purpose.*

process, which is a flexible concept calling for such procedural protection as the particular situation demands, is fashioned first by considering what private interest is to be affected by the agency action and then by what protection must be accorded that interest.[66] An agency decisionmaker sitting in an adversarial contest may neither (1) have a personal financial interest or be a direct competitor [67] with a person who stands before the tribunal nor (2) have been the target of abuse or harsh criticism from such a person.[68]

The due process neutrality mandate has been imposed on executive agency action which affects (1) welfare recipients; [69] (2) the involuntary transfer of a prisoner to a mental hospital; [70] (3) the revocation of probation; [71] (4) the revocation of a convict's "good time" credits; [72] and (5) the revocation of parole.[73] *Although each situation calls for differing levels of due process protection and scrutiny, the neutrality strand is present in all of these instances.* The command also extends to *legislative decisionmakers.* A legislative enactment cannot meet the standards of neutrality when its terms authorize a narrow and

---

**66.** *Due process protects liberty and property interests regardless of which governmental official seeks to affect it adversely. Morrissey, supra* note 47, 408 U.S. at 481, 92 S.Ct. at 2600; *Mitchell v. W.T. Grant Company,* 416 U.S. 600, 610, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406 (1974); *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982).

**67.** In *Friedman, supra* note 63, 440 U.S. at 17–20, 99 S.Ct. at 898–99, the Court made clear that in professional disciplinary proceedings a person has a right to a fair and impartial hearing board; *Gibson, supra* note 55 at 1698; *Ward, supra* note 62; *Tumey, supra* note 62.

**68.** *Taylor v. Hayes,* 418 U.S. 488, 501–03, 94 S.Ct. 2697, 2704–06, 41 L.Ed.2d 897 (1974); *Pickering v. Board of Education,* 391 U.S. 563, 578–79 n. 2, 88 S.Ct. 1731, 1740 n. 2, 20 L.Ed.2d 811 (1968). *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971), teaches more eloquently than any other case *that even an offending or abusive litigant does not lose the constitutional claim to a neutral decisionmaker.* There, the Court observed that "[n]o one so cruelly slandered [as the presiding judge] is likely to maintain that calm detachment necessary for fair adjudication". *Id.*

**69.** *Goldberg, supra* note 52. In *Goldberg* the Court held that welfare recipients were entitled to full evidentiary hearings before their rights to federal funds could be terminated. Although the recipients' main concern was to establish a procedural right to a full evidentiary hearing, the Court noted that *within that right was a right to a fair and impartial decisionmaker. Id.,* 397 U.S. at 271, 90 S.Ct. at 1022.

**70.** In *Vitek, supra* note 50, the Court held that an involuntary transfer of a prisoner to a mental hospital implicated a protected liberty interest and that *due process was not satisfied* by the mere certification of the need for such treatment by a state-designated physician. The Court found that the transfer constituted a deprivation of liberty both because state statutes at issue gave rise to a legitimate expectation on the part of the prisoner. The Court reiterated that due process required (1) notice, (2) time for the prisoner to prepare his argument, (3) a hearing where the prisoner has the opportunity to be heard in person, to present evidence and witnesses, and to cross examine state witnesses; (4) *an independent decisionmaker,* and (5) *a written statement by the decisionmaker.*

**71.** In *Gagnon, supra* note 48, the Court held that because probation revocation (like parole revocation) does result in a loss of liberty, a probationer (like a parolee) is entitled to a preliminary and a final revocation hearing, *under the conditions specified in Morrissey (supra* note 47). *Id.,* 411 U.S. at 782, 93 S.Ct. at 1760.

**72.** *Wolff, supra* note 49. In *Wolff* an inmate sought the restoration of "good time" credits. The Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the *full panoply of rights due a defendant in such proceedings does not apply." Id.,* 418 U.S. at 556, 94 S.Ct. at 2975. *But the Court opined that several due process safeguards, including the right to an impartial committee to decide disciplinary matters, i.e., revocation of "good time" credits, did apply. Id.,* 418 U.S. at 571, 94 S.Ct. at 2982.

**73.** *Morrissey, supra* note 47. In *Morrissey* the Court held that an individual released from prison on parole need not receive the "full panoply" of due process safeguards, but was entitled to some of these protections including the right to have his revocation hearing conducted by someone other than the parole officer that makes the recommendation for revoking his parole. *Among the minimum due process requirements which are the parolee's due, the Court opined, is "a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers". Id.,* 408 U.S. at 489, 92 S.Ct. at 2604.

biased segment of the community to decide certain zoning permits.[74]

Ratemaking for application to a *single* public utility calls for adversary hearings and for application of contested adjudicative facts to the governing norms of statutory and constitutional law. *These attributes combine to clothe this form of ratemaking with characteristics to which the Federal Constitution attaches due process protections. The safeguards include the right to neutral decisionmakers.* To withdraw them from public utilities would clearly contravene federal due process.

**74.** In *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Court struck down an ordinance which permitted the establishment of philanthropic homes for the aged in residential areas, but only upon the written consent of owners of two-thirds of the property within 400 feet of the proposed facility. *See Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912). In *Washington* and *Eubank, supra*, a limited number of people, with obvious biases against devaluation of their individual properties, were authorized by legislation to make determinations for individuals regarding zoning. *A judge who has a financial position adverse to a party before the tribunal is in the same ineligibility category as the unauthorized lawmakers in the cited cases. See also, R. ROTUNDA & J. NOWAK, supra* note 41, § 17.8 at 658.

**75.** PUD–260, a utility rate-setting proceeding, had begun below as an investigation by the director of the agency's public utility division into the effect of the federal Tax Reform Act of 1986 upon Oklahoma utilities. The initial Commission order was affirmed in part and reversed in part and the cause was remanded for further proceedings. *Henry, supra* note 63. *The present controversy over Commissioner Anthony's disqualification arose after the earlier remand.*

**76.** According to his public announcement on file herein, in which he conceded making ex parte statements to certain officials of SWB, he had been serving for nearly four years as informant and investigator of federal-law violations ascribed to certain Commission-regulated utilities. Commissioner Anthony made the following statement on October 2, 1992:

"As Chairman of this Commission, I feel compelled by judicial ethics to advise the parties to Southwestern Bell case PUD 260 that there have been serious irregularities and unethical conduct involving this matter while it has been before the Commission. There is evidence that one or more commissioners were involved in improper conduct, and I have giv-

## C.

### *Southwestern Bell Telephone Company Has A Federal Constitutional Claim To A Neutral And Detached Tribunal*

Petitioner Southwestern Bell Telephone Company seeks this court's command that would disqualify Commissioner Anthony from sitting in Corporation Commission proceeding PUD–260 [75] as well as in *all* pending and future SWB cases. SWB asserts that Commissioner Anthony's public statement of October 2, 1992,[76] considered together with a motion he filed in the case to compel SWB to produce certain notes and documents,[77] make

en this evidence to the FBI. Furthermore, I have filed a bar complaint against two attorneys who have been associated with Southwestern Bell and who may have been engaged in improper activities. The parties to this case should pursue whatever remedies are necessary to protect their rights.

As an additional matter which has at least partial bearing on the PUD 260 case or other Southwestern Bell cases, I am advising the parties that since late 1988 I have worked with the FBI to investigate corruption at the Corporation Commission. On numerous occasions since I became a commissioner in 1989, individuals associated with regulated companies have offered me cash or inducements.

With the FBI advised in advance, on several occasions, I have received thousands of dollars in cash which I immediately gave to the FBI as evidence in their investigation. In cases where cash was received, a utility attorney, a utility lobbyist, and/or a utility officer was involved.

Furthermore, I will report that more than a year ago I separately advised a Southwestern Bell senior corporate officer and then later a senior corporate attorney with Southwestern Bell of the conduct of persons associated with their firm.

I have delayed making this announcement for as long as possible in order to avoid compromising the Federal investigation. I have been advised a limited announcement pursuant to my commission responsibilities should have no adverse consequence on the FBI's investigation. I come forward at this time because the parties to cases at the Corporation Commission have rights which must be protected."

**77.** The notes sought by Commissioner Anthony's motion *relate to conversations he had with a SWB senior corporate officer and SWB senior corporate lawyer about the conduct of persons associated with their firm,* which is believed to be *pertinent to the rate case at hand (PUD–260).*

him ineligible to sit in an individual ratemaking case as a neutral decisionmaker.

Commissioner Anthony's participation in this rate case is constitutionally impermissible for two reasons: (a) he had several ex parte conversations with different representatives of SWB and *most importantly* (b) one who in the same case or in interconnected matters assists in the prosecution of company officials cannot act as a neutral decisionmaker in a related individual ratemaking case.[78] Because the principle of impartiality that governs the *cold neutrality and detachment* of judges must be applied with equal force to decisionmakers in individual ratemaking proceedings,[79] I would declare today that Commissioner Anthony is disqualified in PUD–260 and that his lack of detachment calls for his replacement by the command of federal fundamental law (Part III, *infra*) or in the alternative under the mandate of the state statutory law (Part IV, *infra*). I would also hold that Anthony's disqualification applies solely to this case and should not affect the post-decisional proceedings authorized by this court's February 9, 1993 order in *Southwestern Bell Telephone Company v. Oklahoma Corporation Commission.*[80] That case, unlike PUD–260, has been decided and is now on appeal. I would save for another day the questions (1) whether today's challenge would also disqualify Anthony from participating *in any other pending or future cases in which SWB may be interested or a party* and (2) whether an evidentiary proceeding might be required to determine Anthony's disqualification in utility-rate cases other than PUD–260.

## III

### WHEN A COMMISSIONER VOLUNTARILY RECUSES OR IS COMMANDED TO DISQUALIFY *IN AN INDIVIDUAL RATEMAKING PROCEEDING,* FEDERAL FUNDAMENTAL LAW COMMANDS THIS COURT TO PLACE THE COMMISSION UNDER THE APA REPLACEMENT MECHANISM

The Corporation Commission consists of three commissioners who have the exclusive authority to regulate public service corporations.[81] The concurrence of two commissioners is required to decide any question.[82] Even though the State Constitution allows the Commission to sit with a quorum of two commissioners,[83] to do so in a complex rate case might be inefficient because in the event of a tie vote proceedings would be unduly prolonged.

Oklahoma jurisprudence does not afford a mechanism for breaking a tie when the Corporation Commission decisionmakers are evenly divided. In original proceedings brought here over the last decade this court

---

78. *Northwestern Bell Tel., supra* note 24, 461 N.W.2d at 133 (where the court applied *the due process neutrality mandate* in an individual utility rate case); *see also State ex rel. Okl. Bar Ass'n v. McNaughton,* Okl., 719 P.2d 1279, 1281 (1986) (a lawyer was publicly reprimanded for improperly accepting representation of an adult defendant charged with lewd molestation of a minor and also serving as counsel for the underage victim, her minor sister and their mother in matters connected with his client's prosecution); *Tweedy v. Oklahoma Bar Ass'n,* Okl., 624 P.2d 1049, 1053 (1981); Adan Haji Jama v. The King, Judicial Committee of the Privy Council (1948) (reported in M. MERRILL, CASES AND MATERIALS ON ADMINISTRATIVE LAW, Vol. 1, p. 173 (1950)).

79. *Gibson, supra* note 55; *Friedman, supra* note 63. There can be no legal basis for withholding from individual utility ratemaking hearings the Due Process Clause's protection conferred by *Gibson, supra* note 55. The *Gibson* teachings apply *with the same force to adversary individual utility ratemaking hearings as they do to any run-of-the-mill adjudications.*

80. Southwestern Bell Telephone Company v. Oklahoma Corporation Commission, No. 80,333 (consolidated with Nos. 80,334, 80,340, 80,342 and 80,345). In that appeal we afforded SWB the opportunity (a) to elicit below *after-acquired evidence,* if any there be, that would tend to show Commissioner Anthony was disqualified at the time he sat as a decision-maker in PUD–662, a case different from PUD–260, and (b) to supplement the record in this court by including in it a transcript of the disqualification proceedings to be conducted pursuant to the authority conferred by our order.

81. Art. 9, § 15, *infra* note 115, and § 18a, *infra* note 82, Okl. Const.

82. The terms of Art. 9, § 18a, Okl. Const., are:

"* * * A majority of said Commission shall constitute a quorum, and the concurrence of the majority of said Commission shall be necessary to decide any question."

83. Art. 9, § 18a, Okl. Const., *supra* note 82.

has *twice* come to grips with quests for the recusal of a Corporation Commission member.[84] In *ETSI*[85] the court disqualified Commissioner Townsend, declaring that members of an agency sitting in an adjudicative capacity must meet the criteria of neutral and detached decisionmakers. In *Cooperative Ginners'* the court assumed original jurisdiction but refused to disqualify Commissioners Anthony and Watts.[86] Neither *ETSI* nor *Cooperative Ginners'* was an *individual ratemaking case.*

## The Rule of Necessity

If the law—either state or federal—were bereft of mechanism for replacing a disqualified Corporation commissioner, a "rule of necessity"[87] would permit the challenged agency member to sit in the case. There is

no need *in this case* to invoke the common-law rule of necessity because federal fundamental law affords an effective post-recusal mechanism for replacing a disqualified commissioner.

The Commission's individual ratemaking proceedings[88] and those conducted by the APA-governed agencies[89] comprise but a single class which is entitled to equal procedural treatment. Today's holding—which regards the Commission's public utility ratemaking as legislative, but leaves the same proceedings before APA-governed agencies with all the safeguards of adjudication process—creates a constitutionally impermissible adjective-law dichotomy.[90] *Procedure for individual ratemaking cases before the Commission and that for the identical function exercised by an APA-governed agency must be the same.*

**84.** *ETSI Pipeline Project et al. v. Townsend,* Sup. Ct. No. 58,707 (original jurisdiction assumed and writ granted *by unpublished order* of September 9, 1982), and *Cooperative Ginners' Association of Oklahoma et al. v. Anthony and Watts,* Sup.Ct. No. 78,510 (original jurisdiction assumed and writ of mandamus denied *by unpublished order* of January 28, 1992).

**85.** *ETSI, supra* note 84. The September 9, 1982 order states:

"Writ granted directing the Honorable James Townsend, member of the Corporation Commission, respondent herein, to certify his recusal in Cause No. 27470, on the docket of the Corporation Commission, and to forward a certified copy thereof to the Governor of the State of Oklahoma. *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 [1973]."

No mention is made of Townsend's recusal in the published decision of the case in which he was disqualified. *Missouri–Kansas–Texas Railroad Co. v. State,* Okl., 712 P.2d 40 (1986). *After Commissioner Townsend had been disqualified by an order of this court, the Governor either declined or was never asked to fill the vacancy by a pro hac vice appointment. ETSI* was decided by the concurrence of two elected commissioners who sat in the case.

**86.** The *unpublished order* in *Cooperative Ginners', supra* note 84, states: "Original jurisdiction is assumed. Application for writ of mandamus requiring Commissioners Bob Anthony and J.C. Watts, Jr., to recuse is denied. * * *" There, I joined in *not* disqualifying Commissioners Anthony and Watts. It was *then* my opinion that the "rule of necessity", *infra* note 87, was applicable to Corporation Commission members. *Id.* (Opala, C.J. dissenting from order of January 28, 1992). Since then I have changed my position, now taking the view articulated today in Parts III

and IV of this opinion that the law *does indeed provide a mechanism for replacing a disqualified commissioner.*

**87.** The rule of necessity rests on a well-established common-law principle *that, regardless of bias, judges have a duty to sit if they alone have the power to decide the matter before them. United States v. Will,* 449 U.S. 200, 214–216, 101 S.Ct. 471, 480–481, 66 L.Ed.2d 392 (1980). *Where a mechanism is in existence for replacing a disqualified tribunal member, the successfully challenged decision-maker must step aside. Brinkley v. Hassig,* 83 F.2d 351, 357 (10th Cir. 1936).

**88.** The Commission is exempted from compliance with the Art. II adjudicative process by 75 O.S.Supp.1993 § 250.4(B)(4), but is required to comply with some portions of the APA's Art. I rulemaking provisions. 75 O.S.Supp.1993 § 250.4(A)(2).

**89.** For the definition of an APA-governed agency, see *supra* note 8.

**90.** *Baxstrom v. Herold,* 383 U.S. 107, 111, 86 S.Ct. 760, 762–763, 15 L.Ed.2d 620 (1966), which teaches that when the state singles out some litigants for a less advantageous remedial treatment than that which is afforded others in like proceedings, equal protection is violated unless the distinction bears a rational nexus to some legitimate state goal. *Humphrey v. Cady,* 405 U.S. 504, 508–512, 92 S.Ct. 1048, 1051–1054, 31 L.Ed.2d 394 (1972); *Foucha v. Louisiana,* 504 U.S. ——, ——, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992); *Cascio v. State ex rel. Dept. of Pub. Safety,* Okl., 686 P.2d 282, 284 (1984).

The *post-recusal replacement mechanism* must also be the same. The command for procedural uniformity comes both from the state[91] and federal fundamental law.[92] *Groppi v. Wisconsin*[93] teaches that *conformity to constitutional procedure is compellable even when there is a lack of authorizing provisions in state law.* In *Groppi* the Court held unconstitutional a state law which *permitted a change of venue for felony but not for misdemeanor trials.* When state law does not provide the authority necessary to carry out federal constitutional commands resort may be had to the U.S. Constitution to accomplish the constitutionally mandated objective. Just as the Commission, though not an Art. II APA-governed agency,[94] must conform its inquiries to due process standards,[95]

so also must its individual ratemaking proceedings be governed by compliance with equal protection. I would hence hold, for reasons to be explained in Part III, *infra*, that *when a commissioner voluntarily recuses or is commanded to disqualify, state and federal fundamental law authorizes this court to place the Commission pro tanto under the APA's (Art. II) § 316 replacement mechanism.*[96]

## A.

### The Equal Protection Clause's Mandate For A Uniform Post–Recusal Replacement Mechanism

This court has a duty to obey the Federal Constitution's equal protection mandate[97] for

---

**91.** *See* discussion of the uniformity-of-procedure mandate of Art. 5, 46, Okl. Const., in Part III(B), *infra*.

**92.** *See* the discussion of the Federal Constitution's equal protection commands in Part III(A), *infra*.

**93.** 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). Groppi was a Catholic priest who was charged with resisting arrest. When he was brought to trial he objected to venue on constitutional grounds. The state court ruled that it was powerless to change the trial's venue since state law prevented a change of venue in misdemeanor cases. The U.S. Supreme Court held the state law unconstitutional since it denied the defendant the opportunity to obtain a change of venue when necessary for a fair trial. Faced with a similar constitutional challenge to Nebraska's venue law in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Court, citing *Groppi, supra,* observed "that state laws restricting venue must on occasion *yield to the constitutional requirement* that the State afford a fair trial." *Id.*, 427 U.S. at 563, 96 S.Ct. at 2805 n. 7 (emphasis added). *See also Mayer v. City of Chicago,* 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), where an indigent defendant sought a free transcript in order to perfect his appeal. The Illinois Supreme Court rejected his request because a state court rule provided indigents with transcripts only in felony cases. The U.S. Supreme Court held the rule unconstitutional, stating that the "distinction between felony and nonfelony offenses drawn by Rule 607(b) [an Illinois State rule] can no more satisfy the requirements of the Fourteenth Amendment than could the like distinction in the Wisconsin law, held invalid in *Groppi*.... The size of the defendant's pocketbook bears no more relationship to his guilt or innocence in a nonfelony than in a felony case." *Id.*, 400 U.S. at 195–196, 92 S.Ct. at 415.

**94.** For definition of an Art. II APA-governed agency, see *supra* note 8.

**95.** *Braun, supra* note 63, 609 P.2d at 1273–1274; *Cotton Petroleum, supra* note 63, 732 P.2d at 442–443; *Amoco, supra* note 63, 751 P.2d at 207; *Henry, supra* note 63, 825 P.2d at 1317; *Lincoln, supra* note 63, 827 P.2d at 1319.

**96.** The pertinent terms of 75 O.S.1991 § 316, are:

"A hearing examiner or agency member shall withdraw from any individual proceeding in which he cannot accord a fair and impartial hearing or consideration. Any party may request the disqualification of a hearing examiner or agency member, on the ground of his inability to give a fair and impartial hearing, by filing an affidavit, promptly upon discovery of the alleged disqualification, stating with particularity the grounds upon which it is claimed that a fair and impartial hearing cannot be accorded. The issue shall be determined promptly by the agency, or, if it affects a member or members of the agency, by the remaining members thereof, if a quorum. Upon the entry of an order of disqualification affecting a hearing examiner, the agency shall assign another in his stead or shall conduct the hearing itself. *Upon the disqualification of a member of an agency, the Governor immediately shall appoint a member pro tem to sit in place of the disqualified member in that proceeding.* In further action, after the disqualification of a member of an agency, the provisions of Section 11 of this act [§ 311] shall apply." (Emphasis added.)

**97.** The Equal Protection Clause of the 14th Amend., § 1, U.S. Const., commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *Nord-*

a uniform procedure [98] and provide a post-recusal replacement mechanism. Although states are free to enlarge the basic freedoms guaranteed by the Federal Constitution,[99] they *may not create artificial boundaries* for individual ratemaking hearings that fall within an identical class. To meet equal protection standards *all* persons need not receive identical treatment, but the *distinctive features of a classification must have some relevance to the purpose for which it has been created.*[100] *A classification is not to be measured by whether it discriminates, but rather by whether it discriminates impermissibly or invidiously*[101]—i.e., whether the difference in treatment between the legislative and adjudicative ratesetting remedies *rationally* furthers a legitimate state interest.[102] *The Commission's individual rate-*

*making proceedings*[103] *and those conducted by the agencies governed by Art. II of the APA*[104] *comprise but a single class which is entitled to absolutely equal procedural treatment.*

The goal of ratemaking—whether it be by an Art. II APA-governed agency[105] or by the Commission—is to give the affected parties a fair return upon the fair value of dedicated property. When the ratemaking decision is apt to affect *particular* rights and obligations, the Art. II adjudicative process affords those who are to be affected the right to a trial-type hearing with the safeguards of procedural due process.[106] Because the very same goal that applies to agency ratemaking also governs public utility ratemaking by the Commission, I find *no rational* basis for

---

*linger v. Hahn*, 505 U.S. ——, ——, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).

**98.** *Baxstrom, supra* note 90, 383 U.S. at 111, 86 S.Ct. at 762–763; *Humphrey, supra* note 90, 405 U.S. at 508–512, 92 S.Ct. at 1051–1053; *Foucha, supra* note 90, 504 U.S. at ——, 112 S.Ct. at 1785; *Cascio, supra* note 90, 686 P.2d at 284.

**99.** U.S. Supreme Court jurisprudence is not dispositive of rights guaranteed by state constitutional provisions. States are free to interpret their own due process and equal protection clauses to afford safeguards beyond those granted by the Federal Constitution, even when the state and federal constitutions are similarly or identically phrased. *See Michigan v. Long*, 463 U.S. 1032, 1037–1042, 103 S.Ct. 3469, 3474–3477, 77 L.Ed.2d 1201, 1212–1215 (1983); *Cooper v. State of California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *see also Messenger, supra* note 61, 827 P.2d at 873 n. 42; *Fair Sch. Finance Coun., supra* note 61, 746 P.2d at 1147 n. 46; *Turner v. City of Lawton*, Okl., 733 P.2d 375, 380 (1987). *See generally* Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489, 499 (1977); ROTUNDA & NOWAK, *supra* note 41, § 1.6(c) at 31–32.

**100.** The Equal Protection Clause is violated *when some but not all regulated businesses* in an entire class are excluded from protection of the adjudication safeguards afforded by the APA. *Baxstrom, supra* note 90; *Cady, supra* note 90, *Cascio, supra* note 90; *Wilson v. Foster*, Okl., 595 P.2d 1329, 1332 (1979).

**101.** *See, e.g., Cascio, supra* note 90, 686 P.2d at 284; *Texas Oklahoma Exp. v. Sorenson*, Okl., 652 P.2d 285, 291 (1982).

**102.** "[U]nless a classification warrants some form of heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification *rationally further* a legitimate state interest." *Nordlinger, supra* note 97, 505 U.S. at ——, 112 S.Ct. at 2331–2332 (emphasis added), citing *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439–441, 105 S.Ct. 3249, 3254–3255, 87 L.Ed.2d 313 (1985), and *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

**103.** The Commission is expressly excluded from compliance with the APA (Art. II) hearing provisions. 75 O.S.Supp.1993 § 250.4(B)(4).

**104.** Art. II APA-governed agencies (*supra* note 8) have the authority to set rates in individual proceedings. *See, e.g.*, the State Board for Property and Casualty Rates (36 O.S.1991 §§ 341.1, 900.1 et seq.; *State v. Okl. State Bd. For Property*, Okl., 731 P.2d 394 (1987)).

**105.** APA-governed agency ratemaking, which is explicitly excluded from Art. I rulemaking process by 75 O.S.Supp.1992 § 250.3(2)(b) (*supra* note 28), is governed by the Art. II adjudicative process (75 O.S.1991 §§ 309 et seq.).

**106.** The same due process protections are afforded under the federal administrative system. *American Airlines v. Civil Aeronautics Board*, 359 F.2d 624, 631 (D.C.Cir.1966), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966), teaches that if the administrative process is directed at particular persons—even if it be termed rulemaking—the persons to be affected must be given the same hearing rights as in proceedings that are clearly of an adjudicative nature.

creating a different and less protective procedural classification for *particularized ratemaking before the Commission.*[107] Section 316 of the APA (Art. II) explicitly provides that upon the disqualification of an APA-governed agency member, the Governor shall immediately appoint a "member pro tem[pore] to sit in place of the disqualified member in that proceeding."[108] *Oklahoma cannot, without violating the Equal Protection Clause, withdraw today from public utility ratemaking those essential characteristics of due process—i.e., a decisionmaker's neutrality[109]—which attach to ratemaking before the APA-governed agencies. I would hence hold that by the command of the Federal Constitution's Equal Protection Clause the § 316 provisions of the APA's Art. II replacement mechanism for a disqualified agency member apply to public utility ratemaking before the Commission.*

### B.

***The Uniformity–Of–Procedure Mandate of Art. 5, § 46, Okl. Const., Requires That Individual Ratemaking Procedure In The APA–Governed Agencies And Before The Commission Not Be Materially Different***

Art. 5, § 46, Okl. Const.,[110] prohibits the passage of local or special laws regulating judicial proceedings or inquiry before the courts, commissioners *or other tribunals.*[111] Today's pronouncement violates that section. *It creates an impermissible dichotomy in procedure.* It leaves ratemaking firmly under the rubric of Art. II's adjudicative process for APA-governed agencies but treats *the very same inquiry* before the Commission as "legislative." Because of that dichotomous division, litigants before APA-governed agencies would be entitled to neutral decisionmakers whereas those participating in like proceedings before the Commission might stand subjected to biased hearing examiners. The procedural uniformity mandate of Art. 5, § 46 dictates that litigants in individual ratemaking proceedings before both APA-governed agencies and the Commission be afforded the benefit of the Art. II § 316[112] replacement mechanism.

Because the Legislature has committed itself to one form of procedure for individual ratemaking under Art. II of the APA, this court cannot by judicial fiat *mandate a different concept of procedure* for the Commission. Our own jurisprudence, no less than the Legislature's enactments, must faithfully conform to the state fundamental law's prohibition against non-uniform laws on prohibited

---

**107.** For the Equal Protection Clause of the 14th Amend., § 1, U.S. Const., see *supra* note 97. The Oklahoma Constitution does not have an equal Protection Clause similar to that found in its federal counterpart, but this court has identified a functional equivalent of that clause in the anti-discrimination component of our State Constitution's due process section. Art. 2, § 7, Okl. Const. ("No person shall be deprived of life, liberty, or property, without due process of law."). *See Fair Sch. Finance Coun., supra* note 61, 746 P.2d at 1148 n. 48.

**108.** For the pertinent terms of 75 O.S.1991 § 316, see *supra* note 96.

**109.** *Gibson, supra* note 55, 411 U.S. at 579, 93 S.Ct. at 1698, and its progeny.

**110.** The pertinent terms of Art. 5, § 46, Okl. Const., are:

"The Legislature shall not ... pass any ... special law ...

 * * * * * *

Regulating the *practice* ... in judicial proceeding or inquiry before the courts ... or *other tribunals.*" (Emphasis added).

**111.** *Maule v. Independent School Dist. No. 9, Okl.,* 714 P.2d 198, 203–204 (1986); *Reynolds v. Porter,* Okl., 760 P.2d 816, 822 (1988); *Great Plains Federal S & L v. Dabney,* Okl., 846 P.2d 1088, 1095–1096 (1993) (Opala, J., concurring). The word "tribunal," as used in § 46, includes every agency that sits in an adjudicative capacity. Our fundamental law explicitly charges the Corporation Commission with the responsibility of a "court of record". Art. 9, § 19, Okl.Const. When the Commission acts in an adversary setting in which it is called upon to apply the governing principles of law to the facts in dispute, it sits as a court of record and functions in an adjudicative capacity. *Monson, supra* note 63, 673 P.2d at 842; *Hair v. Oklahoma Corp. Com'n,* Okl., 740 P.2d 134, 141 (1987).

**112.** For the pertinent terms of 75 O.S.1991 § 316, see *supra* note 96.

subjects.[113] Procedure *in like proceedings* must be uniform. Art. 5, § 46, Okl.Const.[114]

## IV.

## A REPLACEMENT MECHANISM COULD BE FAIRLY READ INTO THE STATE CONSTITUTIONAL AND STATUTORY PROCEDURAL REGIME

### A.

*When A Commissioner Voluntarily Recuses Or Is Commanded To Disqualify, There Is A "Vacancy" For The Case Within The Meaning Of 51 O.S.1991 § 8 (Subdiv. 2), Which The Governor May Fill By A Pro Hac Vice Appointment*

While under state law there is no explicit replacement mechanism for a disqualified commissioner, one could be read into our constitutional and statutory procedural regime. The terms of Art. 9, § 15, Okl. Const.,[115] expressly authorize the Governor to fill vacancies in the office of a Corporation commissioner. Generally, when a vacancy occurs in a public office, and the law is silent as to the method for filling it, the terms of Art. 6, § 13, Okl. Const.,[116] expressly confer the power of appointment upon the Governor. Absent a constitutional prohibition, the Legislature may define the contingencies or events that will cause an office to become vacant.[117] The terms of 51 O.S.1991 § 8[118] enumerate several occasions that result in a vacancy. By the terms of 51 O.S.1991 § 10,[119] these offices may then be filled by the Governor. The office of Corporation commissioner, if left vacant by the death, resignation, removal or disqualification of the

**113.** *Reynolds, supra* note 111, 760 P.2d at 822; although directed to the Legislature, Art. 5, § 46, Okl. Const., *supra* note 110, is no less binding on the courts. Special laws are those which single out less than an entire class of similarly affected persons or things for different treatment. A special law is one that rests on a false or deficient classification. *"It creates preference and establishes inequity."* *Barrett v. Board of Com'rs of Tulsa County*, 185 Okl. 111, 90 P.2d 442, 446 (1939); *Maule, supra* note 111, 714 P.2d at 203 n. 30; *Dabney, supra* note 111, 846 P.2d at 1096 n. 12.

**114.** For the pertinent terms of Art. 5, § 46, Okl. Const., see *supra* note 110.

**115.** The pertinent terms of Art. 9, § 15, Okl. Const., are:

"A Corporation Commission is hereby created, to be composed of three persons, who shall be elected by the people at a general election for State officers, and their terms of office shall be six years: * * * In case of a vacancy in said office, the Governor of the State shall fill such vacancy by appointment until the next general election, when a successor shall be elected to fill out any unexpired term."

**116.** The pertinent terms of Art. 6, § 13, Okl. Const., are:

"The Governor shall commission all officers not otherwise commissioned by law. * * * When any office shall become vacant, he shall, unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law."

**117.** The constitutional provisions that confer on the Governor the power to fill vacancies in the office of Corporation Commissioner, Art. 9, § 15, Okl. Const., *supra* note 115, as well as in other state offices, Art. 6, § 13, Okl. Const., *supra* note 116, do not expressly or by implication prohibit the Legislature from determining *when a vacancy may occur*. The "Legislature generally may do, as to proper subjects of legislation, all but that which it is prohibited from doing." *Fair Sch. Finance Coun., supra* note 61, 746 P.2d at 1149; *Tate v. Logan*, Okl., 362 P.2d 670, 674 (1961); *Miller v. Childers*, 107 Okl. 57, 238 P. 204, 206 (1924).

**118.** The terms of 51 O.S.1991 § 8 provide in pertinent part:

"Every office shall become vacant on the happening of any one of the following events before the expiration of the term of such office:

＊　　＊　　＊　　＊　　＊　　＊

"Second. His removal from office or *failure to qualify as required by law.*

＊　　＊　　＊　　＊　　＊　　＊

The fact by reason whereof the vacancy arises *shall be determined by the authority authorized to fill such vacancy."* (Emphasis added.)

**119.** The terms of 51 O.S.1991 § 10 provide in pertinent part:

"(a) *All vacancies in state offices*, except in offices of the members of the Legislature, members of the House of Representatives from Oklahoma in the Congress of the United States of America and members of the Senate of the United States of America, *shall be filled by appointment by the Governor.* * * *"* (Emphasis added.)

incumbent, is among those state offices which, in the exercise of his § 10 powers, the Governor may fill by appointment for the unexpired term.

Subdiv. 2 of § 8 provides that an office becomes vacant upon the incumbent's "failure to qualify as required by law." [120] Although this eventuality is commonly invocable when a public officer fails to do what the law declares necessary before the duties of an office may be assumed,[121] I would hold that Subdiv. 2 is broad enough to create a *pro hac vice* vacancy. In short, when an administrative decisionmaker *fails* to qualify to sit in a case, a *pro hac vice* vacancy results.[122]

### *Auxiliary Post–Recusal Procedure For Filling A Pro Hac Vice Vacancy*

In the exercise of his § 10 authority, the Governor is empowered to declare that a vacancy, which may be filled by appointment, has arisen as a result of one of the eventualities enumerated in § 8.[123] While this procedure is possible of effective implementation when a *permanent* vacancy may occur, it is not likely to put the Governor on notice in case of a *pro hac vice* vacancy occasioned by a recused or disqualified commissioner. No prescribed statutory procedure is found for filling a temporary § 8 vacancy for *a single case.* The Governor neither scans, nor has the duty to monitor, cases in process of adjudication. I would hence depart from the § 10 regime to fashion a *different parallel*

*procedure for pro hac vice* appointments to the office of Corporation commissioner.

When a commissioner's disqualification creates a *pro hac vice* vacancy, the Commission could either notify the Governor and request that the vacancy be filled immediately, or the Commission may wait until a deadlock has occurred before requesting an appointment. The post-recusal mechanism I would craft, which merely supplements the § 10 procedure, will promote a smooth and efficient processing of agency cases. I would caution that a request at *an advanced stage of proceedings* may occasion additional delay. A *pro hac vice* commissioner, appointed while the case is moving toward its completion, would doubtless need additional time to study the record or may require that some of the evidence be re-presented.

### SUMMARY

Today's self-caponizing decisional process closes its eyes (1) to this century's growth of federal due process protections that surround on-the-record or individual ratemaking as well as (2) to the mid-twentieth century "incorporation doctrine" [124] which transformed most of the *Bill of Rights' values into commands enforceable against every nonconforming state government action—legislative, judicial or executive.* Ratemaking for application to a single public utility is individual ratemaking for "special application." *It is clothed with due process safeguards.* Among these is the right to *a neutral decisionmaker.* Oklahoma has recognized (in 75

120. For the text of 51 O.S.1991 § 8 (Subdiv. 2), see *supra* note 118.

121. *See, e.g., State ex rel. Berge v. Lansing,* 46 Neb. 514, 64 N.W. 1104, 1109–1110 (1895) (the official bond was not timely presented); *Brannon v. Perkey,* 127 W.Va. 103, 31 S.E.2d 898, 902–903 (1944) (the oath was not timely administered).

122. The precise precedent for our decision in this case is not easily found. This is so because *before* the 1973 *Gibson* teachings, *supra* note 55, neutrality of administrative decisionmakers had not become a constitutional command. In short, the rule of impartiality, which has always governed the judiciary, did not apply to agency decisionmakers. *Today's mandate for detachment and neutrality is of a federal constitutional dimension.* Recusal cases may hence come to us

from the agencies with greater frequency than ever before.

One judicial commentator points out that "English judges and scholars consider that we [Americans] have simply gone mad" in our tendency to judicialize administrative procedures. *Thus, it is all the more relevant that one of the two elements of "natural justice" which British courts hold essential in all adjudicatory contexts is the right to an unbiased administrative decisionmaker. See Friendly, supra* note 60 at 1269.

123. *See* 51 O.S.1991 § 8, *supra* note 118.

124. *Adamson v. California,* 332 U.S. 46, 68, 67 S.Ct. 1672, 1684, 91 L.Ed. 1903 (1947) (Black, J., dissenting); *Mapp v. Ohio,* 367 U.S. 643, 646–648, 81 S.Ct. 1684, 1686–1687, 6 L.Ed.2d 1081 (1961).

O.S.Supp.1992 § 250.3(2)(b)) this category of contests as a class distinct from general "rulemaking" and placed them under *the strictures of Art. II agency adjudication process.*

Oklahoma *may not today* (1) without violating the *Federal Constitution's Due Process Clause,* withdraw from the Commission's ratemaking for a single public utility the critical component of a decisionmaker's detachment and neutrality; (2) without violating the Fourteenth Amendment's *Equal Protection Clause,* withdraw from the Commission's individual ratemaking the same due process safeguards which must be afforded in like proceedings before APA-governed agencies; and (3) without offending the *uniformity-of-procedure mandate* in Art. 5, § 46, Okl. Const., withhold from individual public utility ratemaking by the Commission .the procedural attributes of adjudication which are ascribed to that proceeding by the provisions of § 250.3(2)(b). I would hold today that in PUD–260 the *Corporation Commission* cannot meet the federal due process standards of neutrality and detachment.[125] I would hence declare that Commissioner Anthony is disqualified and that his lack of detachment calls for his replacement. The replacement mechanism should be drawn either from § 316 of the APA or from the provisions of 51 O.S.1991 § 8.

*My view of Commissioner Anthony's status does not reflect adversely on his conduct of voluntarily assisting in the efforts to expose what he doubtless perceived as corrupt ratemaking practices; rather, it appeals for absolute obedience to the mandatory federal constitutional safeguards for individual ratemaking contests, which so very clearly protect public utilities' property interests from impermissible state action.* Anthony's disqualification need not be feared as a *triumph* of the forces of darkness and as *punishment* for his virtuous deeds. *Far from it.* Ordering Anthony to step aside is to reaffirm

the people's *faith* in the reality of their passionate commitment to *evenhanded* governmental decisionmaking (no matter who, or what interests, may have tipped the scales) and to make the Constitution's rule of fundamental fairness the *ultimate victor* in today's struggle between competing political values.

---

**125.** *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 827–828, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986). Commissioner Anthony's exclusion seems critical to SWB's fate in this case. Though personal bias of one lawmaker in a large legislative body might be viewed as diffused by the multitude of others in the assembly's membership, it is different before a three-member tribunal where there is but a very thin insulation against one commissioner whose neutrality status may be viewed as even marginally clouded. See *Association of Nat. Advertisers, supra* note 24, 627 F.2d at 1193 (MacKinnon, J., dissenting in part and concurring in part).